CHIEF JUSTICE PRYOR
delivered the opinion of the court.
On the 29th of May, in the year 1876, Krauth, Ferguson & Co., pork-packers in the city of Louisville, becoming much embarrassed, made a conveyance or assignment, in trust to John Ferguson, jr., of all the firm property for the benefit of their creditors.
At the date of the assignment this firm was in the pos *559 session of a large quantity of bacon, consisting of hams, shoulders, and middlings, in their warehouse in the city of Louisville, that was taken possession of by the assignee and sold with a view of applying the proceeds to the payment of the firm liabilities.
After the assignment and sale of this property, in a litigation originating with the creditors of the firm and the assignee, the present appellees, the Louisville City National Bank and the Northern Bank of Kentucky, filed their petitions in the Louisville Chancery Court, asserting claim to several thousand of the sugar-cured hams that had been sold by the assignee, and sought to make him liable for their value.
The appellees claim to have derived the title and possession of these hams by virtue of certain warehouse-receipts executed by the firm of Krauth, Ferguson & Co. prior to the date of the assignment.
The firm of Krauth, Ferguson & Co. was indebted to the Louisville City National Bank in the sum of $5,000, upon which John Ferguson, jr., was the indorser, and when the note matured it was renewed by a note for a like amount ($5,000), with the name of John Ferguson, jr., omitted, and a warehouse-receipt executed to the bank for thirty-six hundred sugar-cured canvassed hams, and accepted as collateral security for the $5,000 note. The warehouse-receipt reads as follows:
“ Krauth, Ferguson & Co.,
“Pork-packers and Provision Dealers,
“Louisville, Ky., May 24,1876.
“Received of the Louisville City National Bank thirty-six hundred sugar-cured canvassed hams, weighing fifty thousand four hundred pounds, on storage in our pork - house, which we will deliver on return of this receipt properly indorsed. These hams are to be packed on delivery without cost, and are marked ‘Krauth, Ferguson & Co. Eclipse.’
“Krauth, Ferguson.& Co.”
*560 The claim of the Northern Bank of Kentucky, another appellee, originated in this manner: One J. V. Cowling, in April, 1876, wanting a loan of money from-the bank, and no doubt for the use of Krauth, Ferguson & Co., obtained a loan of $11,500 on his own credit, the bank taking as a collateral, with Cowling’s indorsement, a warehouse-receipt that had been executed to him by the firm of Krauth, Ferguson & Co., and reading as follows:
“Louisville, Ky., April 29, 1876.
“Received of J."V. Cowling, jr., on storage at our pork-house, eighty-two hundred and fifty sugar-cured hams (8250), marked as per margin, and which we will deliver on return of this receipt to us properly indorsed. These hams are to be packed on delivery without cost, and are to be insured by J. V. Cowling, jr. The above hams are marked Krauth, Ferguson & Co. Eclipse.’
“ Krauth, Ferguson & Co.”
These appellees allege that the assignee, John Ferguson, jr., not only took possession of and sold the hog-product belonging to the firm of Krauth, Ferguson & Co., but sold the hams, the title and possession of which were vested in them by virtue of the warehouse-receipts; that he knew of their claim, and upon demand made refused to deliver the hams, and has sold and converted them to his own use.
Although the claims of the two appellees are distinct, there can be no difference in their legal or equitable rights on the facts of this record, and therefore the two cases will be considered together.
The assignee (appellant) resists the recovery against him in his individual right on the ground, that neither Cowling nor the Louisville City National Bank owned any hams in the warehouse of Krauth, Ferguson & Co., or that no hams belonging to them were in the possession of that firm at the date of the assignment. That Krauth, Ferguson & Co., prior to *561 and at the date of the assignment, were the owners of a large number of hams, all stored in their warehouse, and for the purpose of obtaining a loan of the sums of money, alleged to have been loaned b.y the appellees, the warehouse-receipts were' executed and delivered in the name of the firm by one of its members. That there were many thousand hams in the building, having upon them the same trade-mark, “ Krauth, Ferguson & Co. Eclipse,” at the time the receipts were executed and delivered, of different weights and value, and that no hams had been separated, set apart, or marked in any way so as to distinguish the one from the other, or to enable him, as assignee, or the appellees to know or designate what hams were embraced by the warehouse-receipts. That finding the hams in this condition, and in the actual possession of the firm, and all the contents of the warehouse having been assigned to him for the benfit of the firm creditors, he took possession, sold them, and holds the proceeds to be applied to the payment of the firm debts.
The material statements contained in the answer are sustained by the evidence, and the question presented is, what title or interest, if any, did the appellees acquire in the hams by virtue of the warehouse-receipts. The statute, enacted and approved March 6, 1869, expressly authorizes a warehouseman to give to the person from whom he receives the produce, merchandise, etc., a receipt for the same, and that “such receipts shall be negotiable and transferable by indorsement in blank or by special indorsement, and with like liability as bills of exchange now are, and with like remedy thereon.” The warehouseman may also execute a receipt on his own goods for money loaned, etc., and in either instance, whether the property of the warehouseman or his consignor, if the receipt is delivered or pledged by the owner for the loan of money or the purposes of trade, it is a symbolic delivery of the property the receipt purports to represent, sufficient to create a pledge, and is equivalent to an actual delivery, if there is an absolute *562 sale, so as to protect the vendee against the claims of creditors and purchasers. The validity of the warehouse-receipts, however, is not questioned, or their effect when negotiated or indorsed. The framers of this statute seem to have anticipated the difficulty that might arise with the holders of this character of paper in identifying the property it represented and provided by the second section of the act, that “ the receipt shall set forth the quality, quantity, kind, and description thereof, and which shall be designated by some mark, and which receipt shall be evidence in any action against said warehouseman.”
The elementary doctrine that there must be some means of designating the property sold or pledged, and to distinguish it from property of a like kind and description, seems not to have been lost sight of, and such a mark or description is made indispensable, in order to give such paper its negotiable or commercial character. The indorsement of a warehouse-receipt, and its delivery, operated to vest the purchaser with the title and possession at common law; but if not for a specific chattel, and the property it represented was a part of a large bulk or mass of articles that required separation, no title passed until the separation was had.
The doctrine of the common law as to the identification of the property is not changed by this statute; on the contrary, it is maintained, and such particularity required in the descriptive part of the receipt as makes the right of property certain [in the holder. The fact that the hams are branded “Krauth, Ferguson & Co. Eclipse,” the usual or known trade-mark of the firm, and found on all the hams in the warehouse, is not the mark or distinguishing feature required. It must be such as will enable the party to identify the property, and to distinguish it from a similar kind and quality; such is the plain purpose of the statute. If there were no other hams in the warehouse with the same trade-mark on them than those contained in the receipt the description would be sufficient.
*563 The enactment in this regard is but following the rule of the common law, and if the appellees were vested with the title, or had a constructive possession of the hams in controversy as a security for their several debts, the judgment below is proper.
There is no rule better established, both by the law of England and in this country, than that the sale of a specific chattel passes the right of property to the vendee without a delivery of possession, and he may maintain an action of detinue or replevin, or under our Code, an action of claim and delivery upon the refusal of the vendor to comply. The effect of the sale is to pass the title and right of possession, and counsel are mistaken in the suggestion that this court, in the ease of Petitt v. The First National Bank, 4 Bush, 334, announced the doctrine that a delivery of the possession on the sale of a chattel was necessary to pass the title. The principle was there recognized that in an absolute sale of personal property, capable of delivery, the possession must accompany the title to make the sale effectual against creditors, etc., and such has been the repeated adjudications of this court, based on the statute of frauds.
While the sale of a specific chattel passes the property to the vendee, although no delivery is made, the doctrine established by all the elementary writers on the subject, and we believe without an exception, is, that, where the subject-matter of the sale is in bulk, and a certain quantity is sold, to be taken from a greater quantity, no title passes until the separation is made. (Benjamin on Sales, Long on Sales, Blackburn on Sales, Chitty on Contracts, Comyn on Contracts.)
The English cases sustain the doctrine laid down in the text-books with scarcely an exception. In the case of White-house v. Frost, 12 East. 614, it was held that a sale of ten tons of oil in a cistern containing forty tons passed the title to the vendee, and this case, says Mr. Benjamin in his work *564 on Sales, “notwithstanding the explanation by judges in subsequent cases, is scarcely ever mentioned without suggestion of doubt or disapproval.”
The question is thus clearly stated by Bayley, justice, in the case of Gillet v. Hill, 2 C. & M. 530: “ If I agree to deliver a certain quantity of oil, as ten out of eighteen tons, no one can say which part of the whole quantity I have agreed to deliver until a selection is made. There is no individuality until it has been divided.” The innovation on the rule of the common law has been made by the courts of this country. .The leading case of Kimberly v. Patchin, 19 New York, adverse to .. this doctrine, or rather its reasoning, has been followed by subsequent decisions until it may be said there is much conflict in the American authorities on the question.
In that case A had six thousand two hundred and forty-nine bushels of wheat in bulk, and sold B six thousand bushels, and gave him a warehouse-receipt for the quantity without weighing or separation. After this A sold all the wheat to C, who took possession. B. instituted an action of trover against C, and it was held, two of the judges dissenting, that the title of the six thousand bushels had passed to B and a recovery had. The case of Pleasants v. Pendleton, 6 Randolph, decided in the year 1823, has been cited as a strong case in support of Kimberly v. Patchin; but on an examination of that case it will be found that not one of the barrels of flour in the warehouse was branded like the one hundred and nineteen barrels claimed by the plaintiff, and it was there expressly held that the subject of the bargain was so designated as to be clearly distinguishable.
In Kimberly v. Patchin, the whole quantity of wheat in the two bulks was estimated at six thousand bushels, but upon ' measurement there turned out to be more, and the fact that the vendor thought he was selling all, and its near approach to the *565 entire quantity, may have to some extent influenced the judgment of the court in making C liable for the conversion.
The inquiry is made by the learned judge in that case, “ Is it possible in reason and in law (a quantity of wheat being in store) for one man to own a given portion of it and for another man to own the residue, without a separation of the parts?”
If A owned the entire bulk and sold six thousand bushels to B, and the residue to C, more or less, intending to pass the title, and expressing that intention in plain words, what would have been the result? The former owner most certainly would have parted with all his title. Again, suppose A has in store two hundred and fifty bushels of grain, and B deposits with him six thousand bushels merely on storage, and the grain is mixed by agreement? This would be a case of confusion of property where neither would lose his title.
The concession made by the learned judge in the attempt to distinguish between the sale of a chattel that may be distinguished by the description given, such as a horse of a particular size and color, and the sale of a lot of grain in bulk, where each constituent particle composing the quantity can not be identified, is a sufficient response to the inquiry made. It is said in the opinion in the attempt to make the distinction, that “ No person can be said to own a horse or a picture, unless he is able to identify the chattel or specify what horse or what picture it is that belongs to him.” Suppose that A, being the owner of ten horses, then in his pasture, sells to B two of the choice animals, and the residue to C, and expressing his intention, at the time, of passing the title, why will not the title pass as in the sale of the wheat? It is conceded that no title passes, because the right of selection exists, although the intention to pass the title may have been expressed. The horses are all in the pasture from which the two may be taken, and so is the wheat in the bulk from which the six thousand bushels can be separated. It may be impossible to identify each *566 particular grain of a large mass of wheat, and although the subject of the contract is ascertained, still separation must be made before the title passes. A sale of five gallons of oil to be taken from a barrel containing a larger quantity, or of fifty bushels of wheat to be delivered out of a bulk of one thousand bushels, passes no title until separation.
If Dickinson, the original owner of the six thousand two hundred and forty bushels of wheat, the subject of controversy in Kimberly v. Patchin, had sold one hundred bushels of the wheat and five thousand had been destroyed, can it be maintained that the purchaser of the one hundred bushels must bear his proportion of the loss ? or if he had. sold one thousand bushels of the wheat to A without actual delivery, and afterward had sold and delivered to six others the entire bulk of wheat in lots of one thousand bushels each, who of the purchasers would have A’s one thousand bushels? The question can only be answered by adhering to the legal and philosophical rule on the subject, that no title passed to A for the want of separation, and that the subsequent purchasers were the real owners. The bulk of wheat out of which the smaller quantity is to be taken is ascertained, and the lot of horses out of which the two are to be selected is also ascertained, but the title to neither passes until the selection is made in the one case and separation takes place in the other. If the purchasers in the case of the wheat or horses should take possession and agree to hold without any division or separation, the title would pass, and they would hold as tenants in common, but not as the owners of a divided interest.
Nor do we understand that the question of intention, if established or expressed in so many words, necessarily passes the title. The intention to pass title may exist, and still the facts not constitute a sale. This intention is manifested by the nature and character of the contract, the rules of law *567 determining what constitutes a sale and what an agreement to sell; as, for instance, the sale of all the corn in a certain crib, or all the wheat in a certain bulk. It is immaterial to the parties what the quantity may be, the purchaser agrees to take all, and therefore the legal as well as logical conclusion is that the parties intended the title should pass. One, upon an existing agreement, or for a sufficient consideration, may agree to bear tho loss if the property is destroyed, though no title passes, but, in order to become the owner, he must be able to identify what he claims to own.
One may acquire an interest in property owned by another by purchasing an interest in the whole, as the one fifth, or the one half of a given quantity of bacon or grain. He then becomes a tenant in common with an interest that affects the title to the whole. This illustrates the distinction between tenants in common and the interest acquired by the sale of a chattel or a sale of a quantity of grain to be delivered by the owner. To support an action of detinue or replevin, if the interests in the property wrongfully taken are separate and distinct, the parties can not join, but must institute separate actions, and if joint tenants or tenants in common they must join.
In the case under consideration it is insisted there was a symbolic delivery of the possession. If a part of the hams had been wrongfully taken by a mere trespasser, then appellees could not have maintained an action in their own name, because they had no separate and distinct interest, and were neither vested with the title or the right of possession, and to hold they could sue jointly with Krauth, Ferguson & Co. would create them tenants in common, when such was not the contract of the parties, or intended at the time that the one should own in common with the other. The grocer would hardly suppose when he sold to his customer one gallon of oil, to be taken out of a particular barrel, or the grain-dealer, upon a sale of fifty bushels of wheat from his bin, that the *568 vendees became owners in common, and were vested with the title and the right to a separation of their interests. Such can not be the effect of a mere sale of chattels, and because a party may by contract become a tenant in common with the owner, is no argument that the vendee acquires title in a case like this.-
The case of Scudder v. Worster, 11 Cushing, a leading case, fully sustains the position assumed in this opinion. In that case a bill of sale was made to Secomb, Taylor & Co. by Worcester & Hart of two hundred and fifty barrels of pork branded “Worcester & Hart.” The notes of Secomb, Taylor & Co. were taken for the price, the vendors agreeing to keep the pork in store in their cellar at the risk of the purchaser.
Secomb, Taylor & Co. sold one hundred barrels of the pork to Long, and the vendees delivered it. They then sold one hundred and fifty barrels to Scudder, giving him an order on Worcester & Hart. Secomb, Taylor & Co. becoming insolvent, Scudder called on Worcester & Hart for the pork, and they refused to deliver it.
On the trial it appeared that the pork was in the cellar of the vendors, with a larger quantity of a similar brand and others of a different brand, which fact was unknown to the purchaser. The court said, “Had these two hundred and fifty barrels of pork been a separate parcel, or had the parties designated them by any visible mark, distinguishing them from the residue of the vendor’s stock of pork, the sale would clearly have been an absolute one, and the property would at once have passed to the purchaser.”
After referring to the elementary doctrine on the subject, as well as the cases cited by counsel, the court proceeded to say, we “ are clearly of the opinion that the property in the specified one hundred and fifty barrels of pork, taken by the plaintiff under his writ of replevin, had never passed from the vendors, and therefore this action can not be maintained.”
*569 The doctrine of this case has been substantially followed in this state in the cases of Moss v. Meshew, 8 Bush; Newcomb, Buchanan & Co. v. Cabell, 10 Bush; May v. Hoaglan, 9 Bush; Crawford v. Smith, 7 Dana; Jennings v. Flanagan, 5 Dana.
Where a party deposits his grain for storage merely, and it is mingled with other wheat, it is evident he has never parted with his title, and we can not see that the inquiry in such a case is pertinent to an issue like this. All the requisites constituting a sale are wanting. No sale is made, and no right has passed, except the mere right to store the owner’s wheat.
It is not pretended in this case that an undivided interest in the whole bulk of meat was sold, and still the argument of counsel is to the effect that, because an undivided interest may be sold, therefore the title passed upon the facts of this case.
It is insisted, however, by counsel, that a court of equity will relieve because a court of law, by reason of the insolvency of the vendor, can not give adequate relief. If no title or interest passed to the vendee, there can be no equitable lien, and to enforce the specific performance of a contract in the ease of a chattel, if a court of equity will take the jurisdiction, there is as much necessity for identifying the property as in an action at law.
“In equity,” says Benjamin on Sales, page 671, “the courts in certain cases will compel the vendor to deliver the specific chattel sold.” This jurisdiction in a court of equity originated in certain cases on account of the peculiar or intrinsic value of the chattel, and has been extended to cases where the property purchased is not otherwise attainable. (White & Tudor’s Leading Cases in Equity, vol. 1, p. 1113, Pusey v. Pusey.)
This court would be reluctant to follow an authority, or recognize the principle, that, in the ordinary contract for the sale and delivery of personal property, the chancellor would interfere to enforce such agreement, and more particularly *570 when the insolvent has assigned the property for the benefit of creditors.
The question in this case is, were the hams described, in the receipts actually sold or pledged? If no title or possession passed at law, none could in equity. There must be some equitable interest or title, else a court of equity can not decree a specific execution.
It is also urged that the assignee is estopped to deny the sale and identity of the hams by reason of the warehouse-receipts; that the assignors, Krauth, Ferguson & Co., having acknowledged the receipt of them from the appellees, their assignee will not be allowed to show a want of title in the vendors; and that the present action is, in effect, an action of trover and conversion. In order to maintain this action the plaintiff must show title or some special interest, as in an action for the recovery of the specific property; still as it sounds in damages, and Krauth, Ferguson & Co. having admitted they received the hams, both the firm and their assignee would be estopped to deny that fact. The effect of a judgment against the firm in such an action, or their assignee as such, would be to establish a claim only against the assets in the assignee’s hands, and the judgment could give no prior lien; in other words, the money loaned and the interest would be the criterion of damages, to be paid like other creditors of the firm.
This judgment is against the assignee in his own proper person, making him individually liable for the conversion. He is not estopped in such a proceeding to deny title in the appellees. The burden is on the latter to show title, as if the action was against a mere trespasser or stranger to the parties; in fact, when sought to be made liable as a wrongdoer the assignee occupies that position toward the appellees, and they must show title or some interest in the property before they are entitled to such a judgment; and in the attempt to title they must fail, for the reasons already given. Neither *571 title nor possession is shown to have existed with the appellees either before or at the date of the assignment by Krauth, Ferguson & Co. to the appellant. We see no reason to question the wisdom or philosophy of a rule so long established and adhered to in the interpretation of contracts relating to personal chattels, and in our opinion so well adapted to the present wants of trade and commerce.
The judgment in each ease is therefore reversed, and the causes remanded for further proceedings consistent with this opinion.