## DURR ET AL. V. HERVEY.

1. **ATTACHMENT:** *Removing property out of the State.*

    The removal by a debtor of a material portion of his property beyond the limits of this State, not leaving a sufficiency to pay his debts, gives cause for attachment against his property, though he had no intention to cheat, hinder or delay his creditors by the removal.

2. **DELIVERY:** *Symbolical: Transfer of warehouse receipt.*

    A warehouseman's receipt for cotton stored in his warehouse is such a document of title that its transfer, by indorsement or otherwise, clothes the transferree with the legal title and constructive possession of the cotton; and this without notice to the warehouseman of the transfer, or agreement by him to hold for the transferree. By executing the paper he consents to become the bailee of any one to whom it may be transferred, and becomes such bailee from the time of the transfer.

APPEAL from *Hempstead* Circuit Court.

Hon. C. E. MITCHEL, Circuit Judge.

*Smoote & McRae* for appellants.

1. To sustain the attachment under *section 388 Gantt's*

*Digest, subd. 6,* it is necessary to show actual fraud or fraudulent intent. (*40 Ark., 157; 18 La., 367.*) The clause, when construed according to its spirit and meaning, does not cover and include articles of commerce, purchased for market outside of the State, when transported in due and honest course of trade, without fraud or fraudulent intent. *Ib , supra.*

2. The cotton was held as a pledge by Hicks for his debt against Durr, for its purchase money, thus creating a lien superior to the attachment lien, and as a creditor Hicks could assert his claim by inter-plea. (*31 Ark., 34.*) The delivery of the warehouse receipt to Hicks put him in possession of the cotton, as pledgee, until his debt was paid. (*31 Ark., 163; Ib., 155; 37 Ib., 483; 35 Ib., 190;* and especially the notes in case last cited in *37 Am. Rep., 11.*) Any delivery which is sufficient in an absolute sale, is sufficient to create a pledge. *8 How. U. S., 384; 48 Mich., 118; 59 Cal., 154.*

*B. B. Battle and A. B. & R. B. Williams* for appellee.

1. It was not necessary to prove actual fraud or intent to defraud. The statute does not require it, nor is there anything from which it can be implied. (*Section 388 Gantt's Dig., subdivision 6.*) See decisions upon similar statute in *37 Miss., 454; 12 Iowa, 141; 2 McCrary, 198 (upon our own statute); 5 Cold. (Tenn.), 490; 7 Humph., 210.*

2. There can be no valid pledge of chattels, as against creditors without delivery, and no verbal agreement is sufficient to create a lien without change of possession. *24 Ark., 28; Story on Bailments, sec. 297; 2 Kent's Com., marg. p. 581; 96 U. S., 467.*

In this case there was no delivery, actual or constructive. The bailee or warehouseman must accept the order

to deliver, or recognize it and consent to act in accordance with it; and until he does so he is the agent of the vendor. (*Benj. on Sales, 1st ed., secs. 174-5-6-7.*) The memorandum given to Whaley was not a receipt, or intended as such. The indorsement by Durr was a mere order on Hicks to pay Whaley for the cotton. It was never *delivered* by Durr to Hicks, nor was there any understanding that the cotton should be pledged.

SMITH, J.   Hervey recovered a judgment against Durr upon a promissory note.   At the commencement of the action he sued out an attachment, which was levied upon eighteen bales of cotton as the property of the defendant in the writ.   The ground of the attachment was that Durr was about to remove, or had removed his property, or a material part thereof, out of this State without leaving enough therein to satisfy his creditors.   The Circuit Court sustained the attachment upon proof that Durr was a resident of this State, that he was insolvent, that he had frequently, in the course of his business, shipped cotton to St. Louis, in Missouri, and that he had given orders for the shipment of this particular lot of cotton to the same destination.

1. ATTACH-MENT:

Removing property out of the State.

The affidavit for attachment follows, literally, the language of the sixth clause of section 388 of Gantt's Digest, which provides that a creditor may have attachment against his debtor, if he removes or proposes to remove, beyond the limits of the State, a material portion of his property, not leaving a sufficiency to pay his debts.   And the judgment sustaining the attachment is clearly correct, unless the statute implies that such removal is with a fraudulent purpose.   Durr's counsel contend that the clause should be construed as if it read, "with intent to cheat, hinder or delay creditors."   This qualification does occur in sev-

eral clauses of that section, which specifies for what causes an attachment may issue, but it is absent in the sixth clause. The statute enumerates nine causes, and each of these causes is distinct and independent of any other cause. The courts have no power to interpolate terms in a statute, unless there is a necessary implication to that effect. And as an intention to defraud creditors is expressed in some of the grounds of attachment, and omitted in others, the natural inference is that the omission was designed. Hence we conclude that the principle upon which the sixth clause proceeds is the danger of loss of the debt by the removal of the defendant's property, and that it is not necessary to aver a fraudulent intent.

This is the construction that was placed on this clause by Caldwell, J., in *Mack & Co. v. McDaniel, 2 McCrary, 198*. And the same construction has been given to similar provisions elsewhere. *Montague v. Gaddis, 37 Miss., 454; Runyan v. Morgan, 7 Humphries, 210; Friedlander v. Pollock, 5 Cold. (Tenn.), 490; Branch Bank v. White, 12 Iowa, 141; Sherrill v. Fay, 14 Iowa, 292.*

This decision is not inconsistent with the judgment of this court in *Rice, Stix & Co. v. Pertuis, 40 Ark., 157*. For that was an attachment, before the debt was due, brought under section 437 of Gantt's Digest, which requires in terms the averment of fraud before the writ can issue.

A more difficult question arises upon the interest of Durr in the cotton, at the time of the levy. Hicks interpleaded for the cotton, claiming that it had been pledged to him as security for advances. But the court found that the property was subject to the attachment, and that Hicks had no lien upon it.

The testimony is not seriously in conflict, and the result reached is rather a conclusion of law than a finding of facts.

Durr was engaged in the business of buying cotton for speculation, but being without means of his own he obtained the money to pay for his purchases from Hicks, who was a banker at Hope. Durr usually shipped to his factors in St. Louis and drew upon them in favor of Hicks for the cost of the cotton, with one-half of one per cent. added for exchange. The premium on the exchange was all the interest that Hicks had in these transactions. He had none in Durr's purchases. The drafts were attached to the bills of lading. If Durr wished to resell in Hope he had to procure Hicks' permission, and in that case the proceeds were paid into Hicks' hands. The business had been thus carried on for months under the arrangement that existed between Durr, Hicks and the factors.

This particular lot of cotton was purchased of one Whaley, and at the time of the sale was stored in the warehouse of Boyette, Flowers & Co. Whaley held a receipt, or statement in writing, signed by the warehousemen and showing the number of bales, with the marks and weights of each bale. Upon this memorandum or certificate Durr indorsed, over his own signature, "$796.90, O. K." This was intended as a direction to Hicks to pay the specified sum of money. The paper was delivered to Hicks, who paid Whaley for the cotton. According to the course of the warehouse business, the holder of this paper is entitled to demand and receive the cotton described in it from the keepers of the warehouse. Its purpose was to enable customers, whose cotton was in the warehouse, to sell it in the local market. Durr afterwards offered to sell this same cotton, and he gave orders for its shipment to his factors in the usual way. The bill of lading was made out, but never signed or delivered. And the cotton was attached before it was loaded on the train. But Hicks

held the warehouse receipt all the time. The warehouse-men testified that they held the cotton for Durr, after he bought it, until it was received by the sheriff.

2. DELIVE-RY:
Symboli-cal : Trans-fer of ware-house re-ceipt.

It is undoubtedly true that there can be no valid pledge of chattels, against creditors, without delivery. Hence the Circuit Court correctly declared the law to be, that no verbal agreement was sufficient to create a lien on personal property without a change in the possession. But in the case of ponderous or bulky articles, the law sometimes dispenses with manual delivery and substitutes symbolical delivery; such a delivery in pledge is good, whenever it would be good in case of a sale of the same property. Thus a bill of lading is such a document of title that its transfer by indorse-ment, or otherwise, puts the vendee or pledgee into posses-sion. And warehouse receipts or wharfinger's certificates have by long usage been put upon the same footing, and have come to represent the property mentioned in them. To adopt the language of the editors of Smith's Leading Cases, in their note to Lickbarrow v. Mason, 8th Am. ed., vol. 1, pt. 2, 1223, "the exigencies of trade have called a class of instruments into being which are substantially acknowl-edgments by public or private agents that they have re-ceived merchandise, and from whom or for whose account, and usage has made the possession of such documents equiv-alent to the possession of the property itself."

Many of the cases on this subject are collected in *Jones on Pledges, secs. 37, 280, 298, et seq.;* among others *Gibson v. Stevens, 8 Howard, 384; McNeil v. Hill, 1 Wool-worth, 96; Harris v. Bradley, 2 Dillon, 284; Yenni v. McNamee, 45 N. Y., 614; Broadwell v. Howard, 77 Ill., 305.*

But it is argued that the transfer of a warehouse receipt does not amount to a constructive delivery of the goods until the warehouseman is notified and agrees to hold for the transferree. This seems to have been the view taken by

the English courts until Parliament interfered, although it is criticised by Benjamin in his work on Sales, secs. 174-6, 815, et seq. And the same doctrine has been approved by the Supreme Court of Massachusetts, in the very recent case of *Hallgarten v. Oldham, 135 Mass., 1.* But this is certainly opposed to the weight of American authority. And, as observed by the Supreme Court of California, in *Davis v. Russell, 52 Cal., 611,* "no substantial reason is offered for giving the assignment of such an instrument an effect differing materially from that of an assignment of a bill of lading." In *Puckett v. Reed, 31 Ark., 131,* the same principle was applied in the anologous case of a ginner's receipt for cotton.

Our conclusion is that the delivery of the instrument made by Boyette, Flowers & Co. to Hicks transferred to him the legal title and constructive possession of the cotton, and was sufficient to sustain a pledge as against a subsequent attaching creditor of Durr. No importance is attached to the form, or want of form, in this paper. It was in writing, signed by warehousemen, who were known to the business community to be engaged in that business, and it acknowledges that they held eighteen bales of cotton, which are particularly described, belonging to Whaley. Nor does it matter that Boyette, Flowers & Co. considered that they were holding the cotton for Durr. By executing the paper they consented in advance to become the bailee of any one to whom it might be transferred, and from the time of transfer they became Hicks' bailees.

The attempt of Durr to sell, and also to ship the cotton, was entirely consistent with Hicks' relation to the property, and was in the usual course of their business. Hicks' only claim upon it was to be repaid his advances.

Reversed and remanded for a new trial.