BANK OF NEWPORT *v.* HIRSCH.

Opinion delivered June 9, 1894.

*Sale—Delivery—Transfer of warehouseman's receipt.*

The indorsement and delivery of a warehouseman's receipt by the owner of the property described in the receipt, to secure a debt, passes the title of the property to the indorsee, as against the claims of purchasers and creditors.

Appeal from Jackson Circuit Court.

JAMES W. BUTLER, Judge.

*Rose, Hemingway & Rose* and *J. W. & J. M. Stayton* for appellant.

1. If the receipts issued by the compress company were "warehouse receipts," then the bank was the *owner* of the cotton. 31 Ark. 131; 44 *id.* 301; Acts 1887, sec. 7, p. 86; 29 Wis. 34. They were certainly warehouse receipts. No particular *form* is necessary. 1 Smith's Lead. Cases, part 2d, 1223, 8th Am. ed.; 44 Ark. 306; 2 Dil. 284; 31 Ark. 131; 29 Wis. 482; 19 Oh. St. 419; 62 Miss. 86; 19 A. & E. Enc. Law, p. 1123. A receipt may be explained by parol proof, or may even be varied. 19 S. W. Rep. 963; 14 Wall. 601; 19 A. & E. Enc. Law, pp. 1111–1118; 2 Litt. (Ky.) 333; 2 Aik. (Vt.) 204. Even if the two receipts set out were for other cotton than that in controversy, that 'does not aid plaintiff. There is no showing that the bank ever parted with its title. Similar receipts were issued for *every* bale delivered by Jones Bros. to the compress company, and *every* receipt was transferred to the bank; if, therefore, the bank did not acquire the sixty-four bales by these two receipts, it did by others. But the cotton was the bank's, under the agreement. If no receipts had been given, or those given were void for uncertainty or vagueness, the delivery under the agreement was a valid

pledge, good against Jones Bros. or their creditors.. The agreement covered *all* the cotton Jones Bros. should buy. This was certain and definite.   51 Ark. 410 ; 52 *id.* 371.

2.   If the cotton passed to the bank has it ever parted with its title ?   The evidence is positive that it did not and has not. . Since all the receipts, except two, were presented, and the amount of cotton called for delivered, and the balance was held for delivery under the other two receipts, the latter receipts will operate upon the cotton by relation and estoppel.   12 Pick. 307 ; 14 Wall. 600 ; 3 Otto, 582.

*Morris M. Cohn* for appellees.

1.   After detailing the facts, contends that the transactions between Jones Bros. and the bank were simply these :   The bank carried an account with Jones Bros., and they paid it by drafts upon consignees of cotton, which they turned over to the bank for this purpose, their account being credited with the amount when paid. The cotton, under such circumstances, was not the bank's, but belonged to Jones Bros.   44 Ark. 305 *et seq.*

2.   No resulting trust inured to the bank because it loaned money to buy the cotton.   1 Perry, Trusts, (2d ed.) sec. 133; 40 Miss. 788.

3.   The receipts were void for uncertainty of description and vagueness.   They identified nothing. Tiedeman on Com. Paper, sec. 28 ; Jones on Pledges, sec. 317 ; 14 Bush (Ky.), 555.   The receipts are dated before forty-six bales of the cotton had been received, and the first was issued before fifty bales were received. The receipts are valueless.   The course of dealing was such as to render identification of any particular cotton impossible.   23 N. E. Rep. 355, 361 ; 14 Bush (Ky.), 555 ; 9 Lea, 104 ; 14 Wall. 603.

4. The court below found for the appellee. This court will not reverse, if there be any evidence to support the finding. 45 Ark. 41; 49 *id.* 381.

5. There could be no valid pledge without delivery of possession, or the transfer of a valid warehouse receipt. 44 Ark. 305 *et seq.*

6. When parties mix and confuse property in such a way as to render goods unidentifiable, the doctrine of confusion of goods applies. Story, Bailments (8th ed.), sec. 40; 93 U. S. 585.

7. The testimony of Hirsch and Stephens, taken together, shows that when Hicks went to the Bank of Newport, to ascertain what it claimed, it relied wholly on the receipts. As the appellees acted upon that representation, the appellant is estopped to set up any other state of facts. 75 Ill. 516, 522; 54 Miss. 308; 55 Ark. 296; 48 N. W. 771; 41 Miss. 64.

8. In submitting this case, let it be remembered that no declarations of law or fact were asked of the court below by the appellant. And all it relies upon in its motion for a new trial is that the judgment of the court is contrary to the law and the evidence. As to the effect of the judgment under such circumstances, see 53 Ark. 537; *id.* 327; *id.* 161; 54 Ark. 229, 234; 56 Ark. 623.

BATTLE, J. On the 30th day of January, 1892, Hirsch Brothers instituted an action against Jones Bros. & Co. to recover a debt, and sued out an order of attachment, that was levied upon 364 bales of cotton as the property of the defendants. The Bank of Newport claimed the cotton, and the sheriff, by order of the plaintiffs, released 300 bales, but still held sixty-four bales under the levy. The bank filed a complaint in the action, and claimed the sixty-four bales as its own property. On a trial by the court sitting as a jury, the cotton was held to be the property of the defendants; and the bank having re-

tained possession of it, by giving bond, and sold it, and converted the proceeds of the sale to its own use, judgment was rendered against it for the value thereof.

The evidence adduced at the trial tended to prove, substantially, the following facts: In the fall of 1891, Jones Bros. & Co. and the bank entered into an agreement in respect to buying cotton in the market at Newport in this State. The bank agreed to advance money to them to buy cotton, and they were to draw checks on the bank to pay for it, and were to pay the purchase money in full, and in cash, so as to get a good and unencumbered title. The cotton was to be delivered for storage to the Compress & Storage Co. at Newport, when it was purchased; and as it was received the compress company was to issue warehouse receipts therefor, which were to be delivered on the same day, or as soon thereafter as practicable, to Jones Bros. & Co., and they were to transfer them to the bank. This agreement was carried into effect. Jones Bros. & Co. purchased the cotton; the bank paid for it; the compress company received it for storage, and issued to Jones Bros. & Co. warehouse receipts for the same; and they transferred them to the bank. As the cotton was shipped, the bank would deliver to the compress company its receipt for the number of bales that Jones Bros. & Co. wanted to ship, and the bills of lading were taken in their names, with drafts for the amount paid for the cotton attached, and were endorsed and delivered to the bank.

It was agreed at first that every bale should be represented by a warehouse receipt of the compress company, and that the receipt should be kept by the bank until the cotton should be shipped; but the compress company represented that it could not issue receipts for each bale on the day of its receipt, and one receipt was issued for all the cotton received on the same day. The cotton was not described in the receipts, but the

books of the compress company showed the marks of each bale, from whom it was received, by what route, and the date of its receipt. It was marked with blue tags, and was marked from. 5000 upwards. No other cotton was marked in this way. The receipts issued were transferred and delivered to the bank on the night of the day on which the cotton was received, "or, at the latest, a day or two thereafter."

In shipping the cotton, no attention was paid to the dates of the receipts, or to the weights of the bales. Some bales remained at the compress several months; others were shipped shortly after their receipt. The receipts were considered only as representing the number of bales of cotton for which they were issued. The cotton was shipped in this way until there were only sixty-four bales in the possession of the compress company, only one of which was received on any day on which the receipts now held by the bank were issued. The bank held two warehouse receipts of the compress company as evidence of its rights to these bales; one of them bore date the 24th of November, 1891, and was issued for 49 bales; and the other was dated November 30th, 1891, and was issued for 35 bales, the two receipts being for 84 bales in the aggregate. In this there was an error. The receipts should have called for twenty bales less. The 64 bales were marked with blue tags, and numbered as stated (all numbers being above 5000). The books of the compress company showed that they were received from Jones Bros. & Co.

R. M. Johnson testified that he was the cashier of the bank and president of the compress company, and, among other things, as follows: "As the cotton was taken out and shipped, Jones Bros. or the compress company would send word to us, and we would send receipts for the numbers of bales they wanted to ship, and the bill of lading would be taken in the name of Jones Bros.,

with draft attached, and delivered to the bank. The bank kept a separate account of its cotton dealings with Jones Bros. I had full access to the books of Jones Bros., their office being only about forty feet from the bank. I went to their office frequently, and tried to keep a close watch on all cotton received. Don't think they could have bought any cotton without my knowing it. * * * * * * * Samples were kept at the office of Jones Bros., and they were to keep an account of the marks, etc., of the cotton at the press, corresponding with the record kept at the compress ; and the samples were open to my daily inspection, as were also the books of Jones Bros. The samples and tags, and the account kept in the books of Jones Bros. and the compress company, enabled me to keep track of the cotton received. When Jones Bros. wanted to ship a lot of cotton, they would get from us receipts enough to cover the number of bales, get a bill of lading for it from the railroad, and endorse that to the bank, with a draft for the amount of the cotton, which would be placed to the credit of the cotton account of Jones Bros. I have two receipts covering the remaining sixty-four bales, which are as follows :

" 'NEWPORT, ARK., November 24, 1891.—Newport Cotton Compress & Storage Co. Received in good order of Jones Bros. & Co. one bale cotton forty-nine (49) b. c. No. —, to be delivered on return of this receipt properly endorsed and payment of storage. E. B. Douglass, Secretary and Manager. [Endorsed] Jones Bros. & Co. H.'

" 'NEWPORT, ARK., November 30, 1891.—Newport Cotton Compress & Storage Co. Received in good order of Jones Bros. & Co. one bale of cotton thirty-five (35) b. c. No. —, to be delivered on return of this receipt properly endorsed and payment of storage. E. B.

Douglass, Secretary and Manager. [Endorsed] Jones Bros. & Co.'

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"When they (Jones Bros. & Co.) began business they did not have much money—not over $500. We kept an account with them of all money received for their account, and money paid out. We paid out money for their account on check or draft. We credited them with all money received on sales of cotton. When cotton was shipped, and drafts drawn against same, we credited their account when the draft was paid. We charged them interest for the amount they received. The transactions would range sometimes very high during the month. All told, I don't know how much it would be. The largest would be about $70,000 per month. They bought somewhere about 7000 bales of cotton, I think, all told, during the season. The account was kept with them as a separate account. We kept no other account with them. There was no difference, to outside appearances, between this account and any other account kept by the bank with cotton factors. The cotton sold, for which the bank has interpleaded in this case, was not credited on the account of Jones Bros. & Co. until after the sale. It produced $1,723.52. They still owed us $2968."

E. B. Douglass testified that he was the secretary and manager of the compress company; that Jones Bros. & Co. did business with the bank; that they stored about 7500 bales of cotton at the compress; that he issued receipts for the cotton to them, but thinks the bank got them all; that it was understood that all the receipts would be transferred .to the bank, which was done; that he never shipped or delivered any of the cotton until the warehouse receipts were delivered to him; that he had to go to the bank to get the receipts when the cotton was shipped; that all he demanded, when the

cotton was shipped, was a receipt for the number of the bales shipped; that no particular attention was paid to the dates of the receipts, or anything else, except the number of bales represented by each receipt; that when the order of attachment in this action was issued the bank held two receipts for 84 bales in the aggregate, but "there was some error in the matter;" that the receipts should have called for twenty bales less; and that he does not know how the error occurred.

This is all the evidence that the record shows was adduced to prove the ownership and identity of the sixty-four bales of cotton in controversy. From this it appears that the compress company issued receipts to Jones Bros. & Co. for the cotton that they stored with it; and that these receipts were transferred to the bank. The secretary and manager of the compress company testified that the transfer was made. He could do so because the receipts were surrendered to the compress company when the cotton was taken out of its possession. Only sixty-four bales of the cotton stored with it by Jones Bros. & Co. remained in its possession at the bringing of this action, and that is the cotton in controversy. The compress company has taken up receipts for the cotton that it has delivered. Two of its receipts remain outstanding in the hands of the bank, and the cotton in controversy is the only means it has with which to discharge these obligations. It is obvious that this cotton was stored with it by Jones Bros. & Co., and that the receipts issued therefor were transferred to the bank. The trial court evidently found that this cotton was subject to the attachment because it was not received on the day the receipts in question were issued. Was it correct?

The endorsement and delivery of a receipt of a warehouseman to secure the payment of a debt passes the title and right of the property described in the

receipt to the party to whom it is so endorsed and delivered. If the transfer is made by the owner of the property, to whom the receipt was given, for the purpose of securing a debt for advances of money made on the faith of such transfer, it is a symbolic delivery of the property that the receipt purports to represent, sufficient to create a pledge, and is equivalent to an actual ·delivery, and will protect the person to whom it is transferred against the claims of creditors and purchasers. The endorsement and delivery of the receipt have the same effect in transferring the title as the delivery of the property. The warehouseman becomes the bailee ·of the holder of the receipt to whom it is transferred, and ceases to hold for the former owner. Acts of 1887, p. 86; *Shepardson* v. *Cary*, 29 Wis. 34; *Harris* v. *Bradley*, 2 Dill. 284; *Puckett* v. *Reed*, 31 Ark. 131; *Durr* v. *Hervey*, 44 Ark. 301; *Ferguson* v. *Northern Bank of Kentucky*, 14 Bush, 555.

The receipt is not required to be in any particular form. In *Gibson* v. *Stevens*, 8 How. 384, McQueen & McKay purchased of Hanna, Hamilton & Co. 350 barrels of mess pork, and received from them the following memorandum, receipt and guaranty :

"FORT WAYNE, April 4, 1844.

"Messrs. McQueen & McKay,

"Bought of Hanna, Hamilton & Co. 350 barrels mess pork, to be delivered on board of canal boats soon after the opening of canal navigation, at $8.31.—$290.50.

"Received payment in full.  Hanna, Hamilton & Co.

"We guarantee the inspection of the above pork at Toledo, and the delivery on board of canal boats at this place, soon after the opening of canal navigation.

"Hanna, Hamilton & Co.

"Fort Wayne, April 4, 1844."

The pork was, at the time of the sale, in the warehouse of the vendors. On the same day, McQueen &

McKay purchased of D. & J. A. F. Nichols 200 barrels of flour, and received from them a memorandum and receipt as follows:

"FORT WAYNE, April 4, 1844.
"Messrs. McQueen & McKay,

"Bought of D. & J. A. F. Nichols, two hundred barrels of superfine flour, at $3.56¼.          $712.50.

"Received, Fort Wayne, April 4, 1844, payment in full.   D. & J. A. F. Nichols.

"Received the above flour in store, at Fort Wayne, April 4. 1844, which we agree to deliver on board of canal boats here, soon after the opening of the navigation, subject to the order of McQueen & McKay.

"D. & J. A. F. Nichols."

The flour was, at the time of the sale, in the warehouse of the vendors.   One Gibson advanced to McQueen & McKay, on the faith of this pork and flour, and the evidence of title thereto, the sum of $2,787.50, and took from them an assignment of the memorandums, receipts, and guarantees in the words and figures following, to-wit:

"Deliver the within two hundred barrels of flour to E. T. H. Gibson, or order.      McQueen & McKay."

"Deliver the within 350 barrels of pork to E. T. H. Gibson, or order.                McQueen & McKay."

The court held that the documents executed by the warehousemen transferred the property and the possession of the pork and flour to McQueen & McKay, and the vendors from that time held it for them, and as their bailees; that the endorsement and delivery of the warehouse documents to Gibson, in consideration of the advances of money he made to McQueen & McKay, transferred to him the legal title and constructive possession of the property; that the warehouseman, from the time of this transfer, became his bailee, and held the pork and flour for him; and that the delivery of the

evidence of title and the orders endorsed upon them were equivalent, in the then situation of the property, to the delivery of the property itself.

In *Harris* v. *Bradley*, 2 Dill. 284, it was held that "an instrument executed and signed by warehousemen in the following words, 'Received in store for account of Bailey & Weightman 3000 sacks of corn,' is a warehouse receipt, and has an assignable or negotiable quality, and its indorsement and delivery by the persons to whom it was issued pass the title to the corn, and the makers of the instrument are liable to the holder or assignee."

In *Puckett* v. *Reed*, 31 Ark. 131, an assignee based his claim upon a receipt in the following words and figures: "MOUNT OLIVE, ARK., Nov. 27, 1871. Received of William Riley seventeen hundred and forty-two (1742) pounds seed cotton, to be ginned and baled for toll, and delivered to the holder of this receipt. "A. & A. Jeffrey & Co." The court held that the delivery of it to the assignee passed to him the title to the cotton.

From the foregoing authorities, it appears no particular or minute description of property is required to be given in the receipt. But it is also true that "a warehouse receipt for a part of certain goods stored in bulk passes no title until such goods are separated—set apart —so as to distinguish them from the general mass, unless the receipt provides the means of making such separation." *Ferguson* v. *Northern Bank of Kentucky*, 14 Bush, 555; *Union Trust Co.* v. *Trumbull*, 23 N. E. Rep. 355, 361; Jones on Pledges, sec. 317. In such a case no particular part of the goods can be said to be mentioned in the receipt or claimed under it. There is no individuality until the separation is made.

In this case a warehouse receipt was given to Jones Bros. & Co. for each bale as it was delivered, or for all

the cotton received from them on the day of its date.  As it was received, it was tagged and numbered, and the compress company entered upon its books the marks of each bale, from whom it was received, by what route, and the date of its receipt.  In every instance the cotton covered by each receipt was marked and identified so as to distinguish it from the other cotton held by the company.  After the cotton was thus identified the receipts for it were transferred to the bank, and in this way the title to all of it passed to the bank, and the compress company became its bailee, and held the cotton for it.

It is contended by the appellee that the bank holds no receipt of the compress company for the 64 bales in controversy ; and that the two receipts now held by the bank were issued for other cotton.  But it is not controverted that receipts similar to these were issued for every bale delivered by Jones Bros. & Co. to the compress company, and transferred to the bank.  It is, therefore, evident that if the bank did not acquire the cotton in controversy as a security by the receipts now held by it, it did by some others.  There is no contention that the bank has ever transferred its title to the 64 bales of cotton.  The evidence clearly precludes such a conclusion.  Receipts for them may have been surrendered when the same number of bales were delivered by the compress company, but the bank has never relinquished its right to them, and is still entitled to hold and subject them to sale for the satisfaction of the debt owing to it by Jones Bros. & Co.  The loss or destruction of the evidence of the title did not destroy the title.

Reversed and remanded for a new trial.