FIRST NATIONAL BANK OF CINCINNATI *v.* BATES.

*(District Court, S. D. Ohio. March, 1880.)*

WAREHOUSE RECEIPT—ASSIGNMENT—CONVERSION OF PROPERTY—ACTION BY ASSIGNEE.—The assignment of a warehouse receipt transfers the legal title and constructive possession of the property to the assignee, and he may maintain an action for its conversion.

Trover, by the assignee of certain warehouse receipts, to recover for the wrongful conversion of the property.

The petition in this case states substantially that on or about the twenty-third day of December, A. D. 1876, one James B. Grant, being then indebted to the plaintiff in a large sum of money, and anticipating that he might thereafter desire to borrow other large sums of money from time to time of the plaintiff, upon such collateral securities as the said Grant might from time to time be able to furnish, did then and there agree with the plaintiff that any and all property that was left with the said bank as collateral, of what-

ever nature the same might be, whether it was personal chattels or bonds, bills, notes, securities, or choses in action of any kind, or any other property, might be held by said bank as a pledge and collateral to any indebtedness that might then and there exist between the said Grant and the said bank; that in pursuance of said agreement, and upon the faith of such securities as the said Grant agreed to furnish, the plaintiff, from time to time, discounted notes and bills for the said Grant, and loaned him money thereon; that on the twentieth of December, 1876, Grant was the owner of 150 tierces of lard, which he left in store with the defendant, and received from him a warehouse receipt therefor, as follows:

"CINCINNATI, December, 1876.

"Received in store, from James B. Grant, 150 tierces lard, prime steam lard, weighing this day fifty thousand two hundred and fifty pounds net, (50,250 lbs. net,) which are subject to his order upon the return of this warehouse receipt.

[Signed]  "H. M. BATES,
"Per G. BOGEN, Jr."

—And that said Grant, on or about the twenty-third day of December, A. D. 1876, pledged and delivered said warehouse receipt as colateral security to the plaintiff.

That the defendant kept in store large quantities of lard at his warehouse, and, from time to time, issued his warehouse receipts to those for whom he held the property in store; that from long and general usage in commerce and trade such warehouse receipts have now, and for a long time past have had, a well understood import among business men, and heretofore have been and are now extensively used in the city of Cincinnati as a common security in obtaining loans and discounts, and in other dealings with banks and bankers; and that the said warehouse receipt was issued by the defendant to the said Grant, that the same might be used by the said Grant as collateral security in his various business transactions; that the said Grant left the said warehouse receipt as security with the plaintiff, in pursuance of the agreement made with it on the twenty-third day of December, 1876;

that in pursuance of that arrangement said Grant became indebted to the bank for loans made to him by the bank in the sum of $21,146; that he has failed, and refuses to pay the same, and that this sum exceeds the value of all securities left with the bank; that afterwards, under the same agreement and for the same purpose, he delivered to and pledged to the plaintiff the defendant's warehouse receipt for 100 tierces of lard; and that on the nineteenth day of January, 1877, under the same agreement, and for the same purpose, he delivered and pledged to the plaintiff the defendant's warehouse receipt for 50 tierces of lard; that the plaintiff tendered to the defendant the warehouse receipt, and demanded of him the delivery of the lard, which the defendant refused, and still refuses to deliver.

And the plaintiff prays judgment for $9,000, with interest from the twenty-seventh day of September, 1877.

The defendant, by answer, denies:

1. That an agreement was made by the plaintiff with Grant, as alleged in the petition, and avers that such agreement, if made, was void.

2. That before any loan had been made upon the receipts the lard had been delivered in good faith to Grant, without notice that the plaintiff had any interest in it, and that said warehouse receipts had been canceled before they were pledged; denies that they were pledged as collaterals for loans or advances to be made, but were pledged for loans known as call loans long after the lard had been delivered to Grant.

Defendant denies that he had knowledge or notice of plaintiff holding said receipts until a second lard season came around; that he received and held the receipt an unreasonable length of time, and thereby deprived defendant from protecting himself before Grant became insolvent.

3. That they had been satisfied before plaintiff received them, and therefore no interest vested in them.

4. Denies the value of the lard as alleged, and says no offer to pay storage or charges was made.

5. Denies that Grant is indebted to the bank, and denies

that the indebtedness exceeds the value of the securities it holds; and alleges that but for the negligence of the bank, the securities held by the bank would have paid all Grant's indebtedness; that large amounts of illegal interest had been taken, which, if properly accounted for, would satisfy the debt of Grant to the bank, and he denies specifically the other allegations of the petition.

The plaintiff, by replication, denies the allegations of the answer.

The plaintiff asked for the following special charges:

1. We ask the court to instruct the jury that if the defendant received the 300 tierces of lard from James B. Grant into his warehouse, and gave him the three warehouse receipts set out in the petition, and while the said lard was so stored in the said warehouse, the said Grant indorsed the said warehouse receipts, delivered and pledged them to plaintiff, under the paper in evidence called a general collateral, dated December 23, 1876, for money then borrowed, or then due, and as a basis of continued debt, or of continued or future loans, and the plaintiff in good faith, relying upon such pledge, subsequently loaned or continued the loans upon the faith of such warehouse receipts as a security, and which loans are now due and owing the bank, then the lard named in such receipts, from the time of such pledge and indorsement, became the property of the plaintiff to the extent of such indebtedness; and if the defendant afterwards gave the said lard to Grant, or to any one else, without the return of said warehouse receipts, and without the consent or knowledge of the plaintiff, whereby it has been lost to the plaintiff, then the defendant is liable in this action to the plaintiff for the value of said lard at the time of its delivery to said Grant and loss to the plaintiff, and the jury may add to such sum as damages a sum equal to 6 per cent. thereon.   Given.

2. If the bank loaned money to Grant and received the warehouse receipts in question from him as a security for such loan, while the lard was in the defendant's warehouse, under the paper called the general collateral, then these

receipts are valid in the hands of the bank for such money loaned. Given.

3. That if the defendant gave the warehouse receipts set out in the petition to said Grant for lard left by him in defendant's warehouse, and after the same were *bona fide* pledged by said Grant to the plaintiff, as above set out, for loans of money or the continuance of such loans made upon receipts, delivered the lard back to said Grant without the warehouse receipts, and without the knowledge or consent of the plaintiff, then the plaintiff would be entitled to recover of the defendant the value of the lard named in such warehouse receipts as aforesaid, provided the indebtedness of said Grant to the plaintiff, for which such pledge was made, was equal to such value. Given.

4. If the plaintiff and defendant have both suffered by the fraud of James B. Grant, by the defendant leaving the warehouse receipts in question outstanding, and the delivery to him of the lard without the said warehouse receipts, and by the use of said receipts by said Grant, in the ordinary course of business, as a means of credit with the plaintiff, then the defendant must bear the loss. Given.

5. If the defendant, Bates, adopted a mode of doing business with Grant by which he gave him warehouse receipts like these in question, and delivered the property without inquiry for or having the receipts returned to him, and did so in this case while the bank held them as collateral for loans made and now due, such a course of business could not be set up as a defence to this action, if the bank had no knowledge of it, or that the property was delivered up to Grant, or would be, and did not assent to it in any way. Given.

6. Even should it be shown in this case that the proceeds of the lard in question was deposited in the bank by Grant in his bank account, upon which he was daily drawing, that such fact would be no defence to this action unless the bank had notice or knew that the money so deposited was the proceeds of the lard, or that Grant had received the lard from Mr. Bates. Given.

7. That the paper called general collateral contemplates future loans and indebtedness, and covers future collateral that may fall under it, where the loan was under such general collateral. Given.

8. That to transfer the title to property held by a warehouseman, and for which he has given a regular warehouse receipt, to a party as collateral security for a loan, by indorsement and delivery of the warehouse receipt, it is not necessary that the party receiving the receipt as such collateral shall give notice of the assignment of such receipt to him. Given.

9. That if said Bates and said Bogen were carrying on the pork business together under the name of said Bates, each to have one-half the profits thereof, and the said Bates left the entire management and control of the said business to said Bogen, he, said Bates, cannot plead ignorance of anything relating to the business, or the usual modes of conducting it, or in reference to warehouse receipts used in conducting said business, which was known to the said Bogen. Given.

The defendant asked for the following special charges:

1. The warehouse receipts of Bates, copied into the petition, were not negotiable, so that their indorsement and delivery by Grant to the bank vested a right of action therein in the bank against Bates for the lard or the value thereof.

Refused, as written; given as follows: "It did not vest a right of action as upon a negotiable note or bill of exchange, but it did vest in the bank a right to maintain an action for injury to, or conversion of, or for a recovery of, the property."

2. The indorsement and delivery of said warehouse receipts by Grant to the bank created no privity of contract between them which prevented Bates from delivering said lard to Grant unless said Bates had notice of said transfer to the bank. Refused.

3. The only effect of said indorsement and delivery of the warehouse receipts by Grant to the bank was to transfer to said bank the title to said lard and the right to its possession, and to constitute said Bates the bailee of said bank, when notified of said transfer to the bank. Refused.

4. The stipulation of said warehouse receipts that said lard is subject to the order of Grant on the return of said receipts, is personal between said Bates and Grant, and said Bates could waive their return unless he had notice of their transfer to the bank. Refused.

5. If said First National Bank and the warehouse and place of business of said Bates were in Cincinnati, and the same was known to the representative officers of said bank, and they did not, within a reasonable time after said receipts were transferred to the bank, notify said Bates of said transfer, then said bank was guilty of negligence, and said Bates was not bound to keep said lard, but was justified in delivering it to said Grant. Refused.

6. It is for the jury to determine what is reasonable notice, in view of all the circumstances, and the situation and relation of the parties to each other. Refused.

7. If said bank delayed for six months to notify said Bates of the transfer of said receipts to said bank, knowing that said Bates had his place of business in Cincinnati, such delay was unreasonable, and said Bates cannot be sued for said lard or its value. Refused.

8. If the representative officers of said bank knew, while the bank held said receipts, that said Grant was from time to time obtaining said lard in parcels from said Bates, and did not object, then said bank cannot complain if said Bates delivered all said lard to said Grant. Refused.

9. If said bank officers had good reason to believe, from the course of business of said Grant with said Bates, that said Grant was obtaining said lard in parcels from time to time, while it held said receipts, it was their duty to have inquired about it, and to have notified said Bates, and their failure to do so exonerates said Bates from all liability. Refused.

10. If the custom of pledging such warehouse receipts as collateral upon which to raise money was not known among warehousemen, and said Bates had not notice of any such custom, then he is not bound by it, and it did not prevent said Bates delivering said lard to said Grant, and the trans•

fer of such receipts to the bank was not binding on said Bates. Refused.

11. If you find that at the time the four notes were given making up the $21,146 claim set up in the petition—of $7,000, dated August 14, 1877; of $9,000, dated August 16, 1877; of $1,500, dated September 4, 1877; and of $1,500, dated September 6, 1877: $19,500—that all of the lard covered by the warehouse receipts copied into the petition had been surrendered to Grant, so that by that time there was none of said lard in Bates' possession, then said pledge in said notes of "general collaterals" did not transfer said lard to said bank. Refused.

12. If the bank claims the collaterals under the four notes dated in August and September, 1877, about eight months after they were issued, it was the duty of the bank to have first inquired to ascertain if Bates was in Cincinnati, accessible to them. The lapse of time was such as to put the bank on inquiry about the lard before they could hold Bates responsible. Refused, as written; given as follows: "If these loans were made at the date of the last notes; if they were the original loans of that date, and Grant had then presented the bank with these collaterals, which had been given some eight months before that date, it was the duty of the bank to make inquiry in regard to them before taking them as collateral security. If, however, they were renewals of original notes, and the receipts had been pledged as collaterals to the original notes, the renewals would carry the pledges with them to the last note of such renewals."

*Lincoln, Stephens & Slatterly,* for plaintiff.

*I. A. Jordan* and *Jordan, Jordan & Williams,* for defendants.

SWING, J., (*charging jury.*) Upon a demurrer to the evidence we have already determined that this action is in the nature of an action of trover, to recover for a wrongful conversion of the property described in the warehouse receipts. It is therefore unnecessary to determine the negotiable properties of warehouse receipts. We may remark, however, that in the commercial sense of the term they are not negotiable

instruments.    But it is the well settled law that they are as- · signable.

In this view we are required to ascertain, therefore, what rights of property and possession vested in the assignee by the assignment of these warehouse receipts; but in doing this we shall not attempt a review of the numerous authorities cited by learned counsel, or perhaps the more difficult task of reconciling them, as the supreme court of the United States, in *Gibson* v. *Stevens*, 3 How. 399, has declared the law upon this subject, and by this we are governed.

In that case McQueen & McKay had purchased of certain parties a quantity of pork and flour, which was then in the warehouse of the vendors, and had taken from them a written memorandum of the sale, with a receipt for the money, and an engagement to deliver it in canal boats soon after the opening of canal navigation.

There was also a written guaranty that the articles should bear inspection.    Afterwards McQueen & McKay, in consideration of advancements made to them by a commission merchant, indorsed and delivered these papers to the merchant, and the question determined by the court was the legal effect of such indorsement and delivery.

Chief Justice Taney, in delivering the opinion of the court, says: "In the opinion of the court it transferred to him the legal title and constructive possession of the property; and the warehouseman, from the time of this transfer, became his bailee, and held the pork and flour for him; the delivery of the evidence of title and the orders indorsed upon them was equivalent to the delivery of the property itself."

The principle of that case applies to the assignment and delivery of warehouse receipts, and was so recognized by Judge Dillon in *Harris* v. *Bradley*, 2 Dillon, 285, and by Justice Miller, of the supreme court, in *McNeil* v. *Hill*, 1 Woolworth, 96.

The legal title and constructive possession of the property being vested in the assignee of the warehouse receipts, he has the right to maintain an action for its conversion.

If, therefore, the jury shall find from the evidence in the case that the warehouse receipts in controversy were assigned and delivered by Grant to the plaintiff in pledge as collateral security for any general indebtedness which then or might thereafter exist from Grant to the plaintiff, and said Grant was then indebted, or afterwards became indebted, upon the faith and credit of these papers to the plaintiff, and such indebtedness remains unpaid, and the defendant, without the knowledge and consent of the plaintiff, surrendered the lard to Grant, the plaintiff will be entitled to your verdict for the value of the property, not exceeding the amount of the indebtedness by Grant to the bank, and to this the jury may add a sum equal to 6 per cent. in rest to the first day of the term.

The defendant, having delivered to Grant these receipts, placed it in his power to treat with the plaintiff upon the faith of them, and his statement in them that the lard was to be delivered upon the order of Grant, upon the return of the receipts, was a representation upon which the plaintiff had a right to rely; and if, without the return of such receipts he delivered this lard to Grant, it will not protect him in this case.

If the jury find from the evidence in the case that all of the warehouse receipts in controversy were not pledged as general collaterals for general indebtedness of Grant to the plaintiff, but were pledged as special collaterals to secure specific loans, and the loans for which they were pledged have all been paid, then your verdict will be in favor of the defendant; or, if a portion of them were so specifically pledged, the plaintiff would not be entitled to a recovery for those so pledged.

Verdict for plaintiff in the sum of $8,955.20.