Seal, Lawson, Kessler & Co. *vs.* Zell & Sons.

(Decided 12th March, 1885.)

WILLIAM B. SEAL, and others, trading as SEAL, LAWSON, KESSLER & Co. *vs.* OLIVER C. ZELL and HENRY S. ZELL, trading as P. ZELL & SONS.

*Cotton shipped by Mistake to the Wrong persons—Conversion—Trover—Bills of Lading—Act of 1876, ch. 262.*

Z. & Sons, and S., L., K. & Co., were engaged in the manufacture of fertilizers in the City of Baltimore, and employed the firm of G. Bros., as a common agent for the sale of their goods in the State of Georgia.  The fertilizers were sold on credit, and payment was secured by cotton notes of the purchasers, payable to G. Bros., agent for Z. & Sons, or agent for S., L., K. & Co., as the case might be.  The cotton notes were for a certain sum of money with the privilege to the makers of redeeming them at maturity in cotton of a specified quality, and at an agreed price.  When sales were made, G. Bros., forwarded the purchasers' notes to their principals in Baltimore, and when the notes matured, they were returned to G. Bros., for collection.  Some thirty-two bales of cotton received in payment of the fertilizers of Z. & Sons, were shipped through the mistake of G. Bros., to S., L., K. & Co., and the bills of lading

Seal, Lawson, Kessler & Co. *vs.* Zell & Sons.

were also delivered to them ; they sold the cotton and applied the proceeds to the payment of an indebtedness of G. Bros. to them. Subsequently G. Bros., discovering their mistake, sent to Z. & Sons an order on S., L., K. & Co. for the cotton. Demand having been made, and delivery refused, Z. & Sons sued S., L., K. & Co. in trover for the conversion of the cotton. The defendants claimed that they were *bona fide* holders of the bills of lading for value, and that they thereby acquired under the Act of 1876, ch. 262, a perfect title to the cotton, not only as against G. Bros., but also as against the plaintiffs, the actual owners. HELD:

That the plaintiffs not only had a right of property in the cotton, but a right to its immediate possession, and were entitled to bring their action of trover to recover damages for its conversion.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court. Three exceptions were taken by the defendants, one to the admission of certain evidence, one to the ruling of the Court (BROWN, C. J.,) in granting the plaintiffs' prayer and rejecting the defendants' prayers, save the first, which was conceded by the plaintiffs; and the third to the rejection of their special exceptions to the granting of the plaintiffs' prayer. The jury rendered a verdict in favor of the plaintiffs for $1535.26, and judgment was entered thereon. The defendants appealed.

The cause was argued before ALVEY, C. J., STONE, MILLER, and ROBINSON, J.

*William S. Bryan, Jr.,* and *John H. Handy,* for the appellants.

*James M. Ambler,* and *Randolph Barton,* for the appellees.

ROBINSON, J., delivered the opinion of the Court.

This is an action of *trover* brought by Zell & Sons, the appellees, against Seal, Lawson, Kessler & Co., the ap-

pellants, to recover damages for the conversion of thirty-two bales of cotton.

The facts out of which this controversy has arisen are as follows: The appellants and the appellees are manufacturers of fertilizers in the City of Baltimore. Both employed the firm of Goldsmith Brothers, of Atlanta, as a common agent for the sale of their fertilizers in the State of Georgia; and Goldsmith Brothers made their sales through sub-agents in different parts of the State. The fertilizers were sold on credit, and payment was secured by cotton notes of the purchasers, payable to Goldsmith Brothers, agents for Zell & Sons, or agents for Seal, Lawson, Kessler & Co., as the case might be. These cotton notes were for the payment of money with the privilege to the makers of paying them at maturity in cotton of a specified quality, and at an agreed price. When the sales were made, Goldsmith Brothers forwarded the notes of the purchasers to their principals in Baltimore, and when they matured, they were returned to Goldsmith Brothers for collection. The cotton now in dispute consisted of three several lots, known as the *Carroll*, the *Boykin*, and the *Mobley & Hightower* cotton.

As to the Carroll cotton, the proof shows that one King received from Goldsmith Brothers a lot of Zell's fertilizers. The sacks being in very bad condition, occasioned by the acid in the phosphate, Goldsmith Brothers sent King new sacks with the brand of Seal, Lawson, Kessler & Co. upon them, with directions to put Zell's fertilizers into these sacks. This was done, and the fertilizer was then shipped by the order of Goldsmith Brothers to Carroll, and sold by him. As the sacks were branded with the name of Seal, Lawson, Kessler & Co., the notes of the purchasers were taken, payable to Goldsmith Brothers, agents for that firm.

After the dissolution of the firm of Goldsmith Brothers, a printed circular was received from W. L.

Seal, Lawson, Kessler & Co. *vs.* Zell & Sons.

.Goldsmith, with directions to Carroll, to ship the cotton collected on sales of Zell's fertilizer, to Zell & Sons, and the cotton collected on the sales of Seal, Lawson, Kessler & Co's fertilizer, to be shipped to them. Zell's fertilizer having been put in sacks with the brand of Seal, Lawson, Kessler & Co., the cotton received in payment. of this fertilizer was shipped by Carroll, to *Seal, Lawson, Kessler & Co.*

About the same time L. H. Boykin sold for Goldsmith Brothers a ton of Zell's fertilizer, for which he took a cotton note, payable to Goldsmith Brothers, agents for Zell & Sons. The cotton received in payment of this note, Boykin, by the order of Goldsmith Brothers, shipped to *Seal, Lawson, Kessler & Co.*

In the same season Mobley & Hightower, of Hogansville, bought a lot of Zell's fertilizer from Goldsmith Brothers, for which they gave two notes, payable to Goldsmith Brothers, agents for Zell & Sons. In payment of these notes Mobley & Hightower, under directions from Goldsmith, shipped twenty-five bales of cotton to *Seal, Lawson, Kessler & Co.* These several lots of cotton, together with the bills of lading, were received by Seal, Lawson, Kessler & Co., and the cotton was sold by them, and the proceeds applied to the indebtedness of Goldsmith Brothers to them.

Goldsmith Brothers afterwards discovered that the cotton delivered in payment of Zell's fertilizer, had been shipped to Seal, Lawson, Kessler & Co. by mistake ; they gave an order to Zell & Sons on Seal, Lawson, Kessler & Co. for the delivery to them of the cotton. Demand having been made on Seal, Lawson, Kessler & Co. in pursuance of the order, and delivery having been refused, this action is brought by Zell & Sons against them for the conversion of the cotton.

Upon these facts it is insisted that Seal, Lawson, Kessler & Co. were *bona fide* holders of the bills of lading for value, and that they thereby acquired, under

the Act of 1876, chap. 262, a perfect title to the cotton, not only as against Goldsmith Brothers, the consignors and original holders of the bills of lading, but as *against all other persons*. In other words, although the cotton belonged, in fact, to Zell & Sons, and was shipped, and the bills of lading were delivered, to Seal, Lawson, Kessler & Co. by mistake; yet these facts, together with the application by them of the proceeds of sale to the indebtedness of Goldsmith Brothers vested in Seal, Lawson, Kessler & Co. a perfect title to the cotton, not only as against Goldsmith Brothers, but as against Zell & Sons, the actual owners. Such a construction is not warranted, we think, either by the language of the Act, or the obvious purpose for which it was passed. The first section of the Act provides, that *bills of lading* shall be *negotiable in the same sense as bills of exchange and promissory notes*, and that full and complete title to the property mentioned in the bills of lading, and all rights and remedies incident thereto, are vested in each and every *bona fide* holder thereof for value, unaffected by any rights or equities between *the original or any other prior holders or parties to the* same, &c.

The title which the *bona fide* holder therefore acquires is the title of the consignor, the original holder, and all other prior holders or parties to the same, unaffected by any rights or equities as between such parties. This, the Act of 1876, declares in plain and unambiguous terms.

That one can take the property of another person, and by putting it in the hands of a common carrier, and by transferring the bill of lading to a consignee without the knowledge or authority of such person, and thereby vest a perfect title to the property in the consignee, not only as against the consignor, but as against the owner himself, is, to say the least, a novel mode by which property may be lost and acquired. There is nothing certainly in the Act of 1876 to justify such a contention.

Prior to the passage of that Act, bills of lading were *quasi negotiable* only, that is to say, they represented the property described in them, the transfer of which operated as a symbolical delivery of the property itself. By the Act they were made negotiable in the same sense as bills of exchange and promissory notes, and the *bona fide* holder acquires title to the property as against the original and all other prior holders. If the cotton then belonged to Zell & Sons, and was shipped without their authority to Seal, Lawson, Kessler & Co., and the bills of lading transferred to them, the title thereby acquired could not enure to the prejudice of Zell & Sons.

So the question, after all, resolves itself into this, did the cotton belong to Zell & Sons? Now, the proof shows beyond question that it was delivered in payment of Zell's fertilizer. Seal, Lawson, Kessler & Co. had no interest whatever in the notes in payment of which it was delivered. These notes belonged to Zell & Sons, and the cotton delivered in payment of these notes was their cotton. They not only had a right of property but a right to its immediate possession. The cotton was *earmarked*, and they could have replevied it in the hands of Goldsmith Brothers, their agents, or in the hands of Seal, Lawson, Kessler & Co., to whom it was consigned; or, upon a demand and refusal by them, they had a right to bring an action of trover to recover damages for its conversion.

The exceptions to certain parts of Goldsmith's testimony are, in the view we take of this case, wholly unimportant. Excluding all of his testimony to which objection was made, the conclusion we have reached is fully sustained by the testimony of other witnesses. Finding no error in the rulings below, the judgment will be affirmed.

*Judgment affirmed.*

(Decided 12th March, 1885.)