## No. 13,577.

## MARKS & RITTNER vs. NEW ORLEANS COLD STORAGE COMPANY.

### SYLLABUS.

1. The undertaking of the cold storer being to preserve goods liable to undergo, or actually undergoing deterioration through the development in them of insect life, it is not necessary, in order to recover against him for damage to goods, to prove more than that the goods, when delivered into his cold storage, were, according to the usual and ordinary test of commerce, sound.

2. For the deterioration of the goods while in his cold storage he is responsible, notwithstanding that in the heading of the receipt issued for the goods there is printed a limited liability clause to the effect that he is not responsible for "damage" to goods.

3. Interested persons are by our law competent witnesses, and their testimony is binding on the court, unless overcome by counter testimony or irreconcilable with the known facts of the case.

4. The warehouseman has a right to hold possession of the goods stored with him until the amount due him for storage is paid.

5. The amount due for storage on goods cannot be compensated by an unliquidated claim for damage suffered by the goods.

### ON REHEARING.

1. A cold storage company may, by contract, limit its liability to the extent that liability may be limited.

2. The limited liability clause should be specific and include in its terms all damages and acts for which the cold storer does not hold himself responsible.

3. A paper admitted in evidence, without objection, will be taken as the commencement of proof of a particular fact.

4. The holder of the receipt is entitled to delivery of the property stored upon tender of payment of charges on the property itself, and payment of

charges on other property of owner cannot be required before delivery. There must be a tender made in due form of the charges.

5. Storage is due on damaged goods for which the storer is made to pay.

APPEAL from the Civil District Court, Parish of Orleans.— Theard, J.

*William S. Parkerson,* for Plaintiffs, Appellants.

*McCloskey & Benedict,* for Defendant, Appellee.

The opinion of the Court was delivered by

PROVOSTY, J. Having on hand large quantities of cow-peas, and June coming on when cow-peas are in danger of being damaged by weevils in the climate of New Orleans, the plaintiffs separated the mixed peas from the straight clay peas and put the latter, the more valuable, in the cold storage warehouse of the defendant company for preservation until the opening of the next season, say March following. The quantity thus stored was 13,028 sacks, and the transfer to the cold storage was effected between the 9th and the 18th of June. Afterwards, a few days more than a month afterwards, between the 19th and 30th of July, plaintiffs transferred to the same cold storage what they still had on hand of the mixed peas, namely 2,099 sacks. In the course of the following season, plaintiffs withdrew the peas from the cold storage as the requirements of their trade demanded, until the defendants refused to make further deliveries, claiming the right to hold the peas for unpaid storage, and thereupon the plaintiffs immediately brought the present suit. This was in July, 1898, a year after the peas had been stored.

Plaintiffs allege that of the peas withdrawn 642 sacks were damaged, and had to be sold for $433.19 instead of $1,249.96, the regular price; and that defendant owes them the difference, viz.: $816.77, the damage having come about through its fault. And they allege, further, that the defendant refuses to deliver to them the remainder of the 13,028 sacks of peas, namely 1,250 sacks; that the same are damaged to such an

extent as to have lost all value; that the damage came about through the fault of defendant, and that defendant owes the value, viz.: $2,458.33. And plaintiffs allege, further, that of the 2,099 sacks of peas defendant still holds and refuses to deliver 1,360 sacks, and owes the value, $616.05. Plaintiffs do not say that these 1,360 sacks are in any worse condition than they were when put in cold storage.

The defendant denies that it has been in fault; avers its rights to detain the cow-peas until payment of the amount due for storage, and claims in reconvention the amount thus due, namely $1,896.65.

At the request of the plaintiffs the peas detained by defendant were sold by the sheriff soon after the institution of this suit. The 1,250 sacks sold for $431.72, and the 1,360 sacks for $198.98.

The business of the defendant is to preserve perishable articles by means of cold air. Articles received by defendant for preservation are supposed to be liable to undergo or to be actually undergoing a process of deterioration through the development in them of insect life, and the undertaking of defendant, for which it is paid more than quadruple the price of ordinary warehousing, is to prevent or arrest this process. In order to recover against defendant, therefore, it is not necessary for plaintiffs to show that their goods were not affected by insect life when put in cold storage, or that the process of deterioration had not begun in said goods, but that said goods, by the usual and ordinary tests of commerce, were classed as sound.

The two plaintiffs and Mr. McMillan testify positively and emphatically that they tested every sack of the peas, this test being made as the peas were being hauled to the cold storage, and found the peas to be perfectly sound. The interest of these witnesses detracts from the weight of their testimony. (Mr. McMillan has against the defendant a claim similar to that of the plaintiffs.) But the witnesses are three in number; they are by our law competent witnesses; they are business men of this city; and, after all allowances have been made, their testimony is binding on the court. The supposition of these witnesses having been mistaken is excluded by the fact that they were large dealers in peas, entirely competent to test the peas, and by the further fact that the testing of the soundness of a pea is a very simple matter; a sound pea being cold, and a weevily pea hot.

The superintendent of the cold storage testified to the machinery of the cold storage having run perfectly while the peas were in cold storage, and a large number of dealers in different kinds of perishable

articles who had goods in the cold storage during the time that the peas of the plaintiffs were there testified to their goods having been properly preserved; and we have no doubt at all that the machinery of the cold storage was properly run.

The peas, then, having been sound when put in, and the machinery having run regularly, it must be that the damage to the peas occurred before the cold had penetrated sufficiently to arrest deterioration. If so, defendant is responsible; for it was its business to know what quantity of peas it could safely admit at one time into its cold storage.

This responsibility of the defendant the superintendent of the cold storage, Mr. Scratchly, was alive to, for we find him cautious about letting in the peas too fast. "Saw Mr. Scratchly," says Mr. McMillan, "and asked him whether he couldn't take them a little more rapidly, as we wanted to get them in, and he said they were having a little difficulty with the temperature keeping it down to where it should be, and he would only take in a certain amount a day, as he didn't want to endanger the temperature of the warehouse."

We can explain the deterioration of the peas in no other way than by assuming that the superintendent was not cautious enough, and did "endanger" the temperature of his cold storage by letting in the peas too fast or in too great quantities. The largest quantity the defendant had ever stored previously was from 6,000 to 7,000 sacks, whereas this time, in the brief space between the 9th and 18th of June, it undertook to accommodate 13,028 sacks for plaintiffs and 26,099 sacks for McMillan & Co.

There is evidence that the peas were stored too much in a pile, and we must say this evidence is but very faintly contradicted by Mr. Scratchly.

Of the 13,028 sacks of peas 5,422 were transferred into the cold storage directly from the cars that had brought them from Tennessee, and 7,606 were transferred from the warehouse of Holmes & Co. in this city. The peas transferred from the cars came out of the cold storage all sound. Defendant argues that since all the peas from the cars came out sound, and the peas from the warehouse of Holmes & Co. came out damaged, it must be that not the cold storage but the warehouse is responsible for the damage. The argument, though possessing considerable force, is by no means conclusive. In the first place, not all the peas from the warehouse of Holmes & Co. came out of the cold storage damaged, but only some of them; 5,910 sacks came out sound; a

larger amount than the total quantity that came from the cars. The peas from the warehouse of Holmes & Co., which had been subjected for sometime to the temperature, of New Orleans, may ·have carried with them into the cold storage a greater quantity of heat than did the peas direct from· Tennessee. Moreover they may have been stored less advantageously.

The loss resulting to the plaintiff from the· deterioration of the 642 sacks of peas is not proved. As to these 642 sacks we must therefore non-suit plaintiff.

The· defendant had a right to hold possession of the peas until the storage was paid. C. C. 2956. The storage could not be compensated by the plaintiff's unliquidated claim for damages. C. C. 2209. Plain‑ tiff can therefore recover nothing for the 1,360 sacks that were in a damaged condition when put in the cold storage. It is not alleged that these 1,360 sacks deteriorated while in the warehouse of plaintiff; the only allegation is that defendant refused to deliver them up; and, since we have held that defendant properly so refused, we can allow the plaintiff nothing on this demand.

The price for which the peas were sold belongs to plaintiff, subject, however, to the pledge of the defendant to secure the amount due for storage.

Of the 1,250 sacks, 1,054 were damaged. These were sold at 19½ cents per bushel. Had they been sound they would have brought 36½ cents per bushel. Plaintiff is entitled to recover from defendant the difference. There were 1,578 bushels, which, at 17 cents per bushel, the difference between 19½ and 36½, amounts to $268.26.

The sale made by the sheriff, having been made at the instance of the plaintiffs, was the act of the plaintiffs, for which the plaintiffs alone are responsible. This sale must be held to be the exact equivalent of a private sale made by the plaintiff. As such it measures the value of the peas at the ·time they were taken out of the cold storage and sold.

On the reconventional demand defendant is entitled to judgment as prayed, with recognition of the depositary's pledge on the price of the peas sold by the sheriff.

The defendant was sued on its general liability as a cold storer, and it answered by a general denial. It did not plead any special contract. But we find that in the heading of the receipts issued to the plaintiffs for the peas there is printed the following limited liability clause: "It is expressly understood and admitted that this company do not inspect

or examine condition of goods in receiving same, and therefore are not responsible for contents or damage; it is also further understood that this company will not be responsible for variation in temperature that may arise by accident to machinery or other unforeseen causes. This company will make special contracts at increased rates above tariff when parties storing require guarantee of temperature. In this case goods will be *inspected and examined* at the expense and risk of storer. This company reserves in such special contracts that 48 hours notice to the storer that machinery or building is disabled will terminate such contract and their responsibility under same. Not accountable for leakage, depreciation or damage by rats."

This clause is not specially insisted on in the brief, nor was it pressed in the argument, but giving the defendant the full benefit of it, we do not think that it relieves defendant of its obligation as cold storer to preserve the goods in the condition in which they were when received.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be set aside and that the plaintiffs have judgment against the defendant for the sum of two hundred and sixty-eight dollars and twenty-six cents ($268.26), with five per cent. per annum interest from this day.

It is further ordered, adjudged and decreed that the price of the sale made by the sheriff in this suit belongs to the plaintiffs, but that the same is subject to the privilege in favor of the defendants hereinafter decreed.

It is further ordered, adjudged and decreed that the demand of the plaintiffs for eight hundred and sixteen dollars and ninety-seven cents ($816.97), difference in the price of the 642 sacks of peas sold as damaged, be rejected as in case of non-suit.

It is further ordered, adjudged and decreed that the defendant have judgment against the plaintiffs for the sum of one thousand eight hundred and ninety-six dollars and sixty-five cents ($1,896.65), with five per cent. per annum interest thereon from the 18th of October, 1898, and that to secure this judgment the defendant have a depositary's privilege on the price of the sale made by the sheriff in this suit.

It is further ordered, adjudged and decreed that the defendant pay the costs of the main suit in the lower court and the costs of appeal; and that the plaintiff pay the costs of the reconventional demand.

## On Rehearing.

BREAUX, J.   Application was made for a rehearing on a number of grounds which we considered sufficient to reopen the case and hear further argument.

Plaintiffs contended that the loss resulting from the deterioration of peas was amply shown, and that our decree should be amended so as to allow them an amount equal to this loss.   Secondly, that defendant had no right to hold possession of the property stored until all charges had been paid, for the reason that plaintiffs were always willing to pay storage on any goods which they would withdraw, and the twelve hundred and ninety and 59-100 dollars admitted by plaintiffs in their petition to be due was for storage on the goods already withdrawn; that an amount claimed of six hundred and six and 6-100 dollars, and heretofore allowed, was never earned.   The charge was for preservation of goods, which had not been earned; that the price fixed in the decree for the peas was too low and that it should be increased to an amount equal to the value of sound peas at the time.

Defendant made no application for a rehearing, but in argument at bar, through its learned counsel, contended that all the issues should be reconsidered and the whole claim rejected.

There was much said by defendant's counsel in argument which was persuasive, in view of the restricted liability stipulated in the contract of storage between plaintiffs and the defendant.

Heretofore it was considered that throughout the trial the burden of proof was with plaintiff, in view of this contract. None the less, after having considered the evidence, the court concluded that its weight was with plaintiffs, and rendered its decree accordingly.

We are impressed by the argument of defendant's counsél, made with force and clearness at bar, that our decision would perhaps prove somewhat of a hindrance to the cold storage industry.   In consequence, as relates to storage, we are moved to go over the entire ground again.

The evidence, as heretofore considered, led us, we think, to a correct conclusion, although the *practical observation* of witnesses who testified in this case did not entirely accord *with entomological* science.   We point out the difference between the two.   Our conclusion is that, in the main, the difference is not considerable.   Practically, it was thought by the witnesses that the insects by which the peas were destroyed were a part of the pea, coming spontaneously from it, and growing with it,

and that when they reach the perfect condition, they flew away, committing no further damage.

We have found, after consulting several authorities, that entomology teaches that in the early spring the female weevil (*Bruchus pisi,* the pea weevil of the naturalist) fastens its egg upon the newly formed pod of the pea in a way that renders it difficult, at first, to find that the grain is attacked. The egg gives birth to a white larva which feeds on the substance of the pea, and takes its life from it. The farinaceous substance of the grain is favorable to its growth, and it is while thus growing that the damage is done. When this larva passes into a perfect state, the weevil bores through the pods, and, as a destroyer, commits no further damage except in giving birth to eggs, which are inserted in the pea as before mentioned.

Cold storage will not destroy the weevil; it can only check its growth and development while in an embryo state. In winter the weevil finds shelter from the cold in the cracks of walls and other secluded places. It does not increase. The cold destroys many. In summer they invade the different cereals. They do not lay their eggs on the surface, but at some depth in the heaps of grain; a very minute dot on the surface of the pea being the only external evidence of the presence of a weevil larva.

We infer that in this case the presence of the weevil or of its larva and the extent of the damage escaped the attention of the plaintiffs and the defendant. All agree that in cold air the weevil does not lay eggs and the larva is harmless. But it takes a temperature of, at least, ten degrees centigrade to check their increase. Here cold storage becomes useful, and is, when the peas have been properly stored, some protection against damage by weevil.

There are methods of destroying them that give rise to interesting study to the student of entomology. We are reminded by the necessity of some brevity that, although the subject is interesting, we must not pursue its study any further, and that we must limit our discussion to the work the cold storage undertakes when it receives peas on storage, and this we think we have done by indicating the degree of temperature required to check the growth of insects of the weevil kind.

Our decision found that the heaps of peas were too large, and that the defendant did not sufficiently look after the ventilation of the cold air it controls. After a re-examination, we are not satisfied that an error has been committed. Defendant places great reliance upon the

receipt it gave for the peas and the limited liability clause printed therein. We understand that the defendant can limit its liability, and that those who sign the limited clause will be bound by its terms. But in this case oversight and negligence have been found which are not covered by the limited liability clause of the receipt, and from which we do not understand from the testimony that it ever was the intention to relieve the defendant. Certainly, the language used leads to such inference. One may stipulate waiver as extensive as he pleases, proivded it does not contravene rules and laws enacted on grounds of public policy. The waiver must express the full extent intended.

We take up for decision each item separately.

An exhibit identified by the letter A is annexed to the plaintiffs' petition and clearly shows that the cow-peas for which it accounts were sold from April 8th, 1898, to July 22nd, 1898, for four hundred and thirty-three and 19-100 dollars. This exhibit was offered in evidence contradictorily with defendant who permitted it to be filed without objection. We think we are warranted in considering it to be properly before the court, and that it and other evidence shows that plaintiffs are entitled to $689.28, on item represented by statement A. If sound, they would have brought, it appears, ninety cents per bushel—eleven hundred and twenty-two 47-100 dollars. They sold for four hundred and thirty-three 19-100 dollars. The difference they would have brought if not weevily is six hundred and eighty-nine 28-100 dollars.

In seeking to fix the value of these peas (not weevily when delivered to storage company), our attention was arrested by the testimony of a witness of the defendant who said that he, in 1898, commenced selling peas at 90 cents. Mixed peas were sold for 75c per bushel; Whip-poor-will at 85c. Another witness spoke of 80c as having been the selling price. True, plaintiffs' peas were of the better quality of clay peas and worth from 10c to 25c more than the other. Taking the minimum of value of the ordinary and mixed peas and the minimum additional for the clay peas, we fix the price at 90c a bushel. It must be remarked that these peas were carried over by plaintiff from the season of 1897 to be sold in 1898, when they were not as valuable, we infer from the testimony, as they were in 1897, and not as fresh as they were in the latter year.

The next ground of complaint is based on the refusal of the defendant to deliver the peas to plaintiffs before the storage was paid. Defendant held possession and claims for storage while it held possession.

Plaintiffs deny defendant's right to recover for this storage because, as they aver, they offered to pay charges for storage which they assert defendant refused to accept.

Plaintiffs' contention is that separate negotiable warehouse receipts had been issued by the defendant for the peas; that defendant could not in law refuse to deliver the peas called for by one of the receipts, upon the ground that the storage on other peas which had been withdrawn on other receipts had not been paid. In other words, that it was not an advance made on the deposit, nor a claim arising from the deposit of the particular goods stored which plaintiff wished to withdraw from storage. Plaintiffs say that they were willing to pay storage on the goods they desired to withdraw, but on none other, although, as we understand, there were other charges due.

The Statute 156 of 1886 is clear enough that on the presentation of a warehouse receipt properly endorsed and the tender of charges upon the property represented by it, the holder of the receipt is entitled to the property it covers. While it is true that under the terms of this statute the holder of the receipt is entitled to delivery of the property upon the tender of payment of all charges on the particular property for which the receipt calls, yet there must be a tender in order to enable the holder of the receipt to recover damages growing out of delay in not delivering the goods when delivery was timely and properly asked.

Here there was no tender made. There was an offer such as is usual in a business community during the course of business, as will be seen from the following which is copied from the testimony:

### Cross-Examination.

"Q. Did you tender them in cash the amount of money due on those peas?

"A. No, sir; not in cash.

"Q. Did you tender them anything?

"A. No, sir."

Clearly, this being the fact as relates to tender, plaintiffs continued to owe storage on the property which they did not offer to withdraw by making the tender the statute requires.

Plaintiffs claim the amount of six hundred and six and 6-100 dollars for storage on the damaged goods. The complaint on this score is that plaintiff was to pay four times the ordinary warehouse charges, and that, as defendant did not preserve the peas, it failed in performing its

contract, and is, in consequence, not entitled to anything; that it should not recover compensation for failing to do that which it had bound itself to do. The defendant did not succeed in preserving the property, it is true, but, at the same time, it does not appear to us that there was such culpable negligence as renders it necessary to hold that it has lost all right to anything for the services it did render, although it failed.

The property stored, although damaged, retained some of its value; besides, defendant is condemned to pay its value, that is, to make up for the loss by paying the difference between sound and unsound peas. It should receive storage on the theory that if these peas had been sold in a sound state, defendant would have received storage.

Plaintiffs complain of the value of the peas as found by the court. The original opinion states, and this is not denied by plaintiffs, that it was at plaintiffs' request that the peas were sold at public auction. The theory of the opinion was that plaintiffs had not complied with the statute cited *supra* with regard to tender, and that defendant was not alone at fault for the delays in disposing of the peas; that plaintiffs, also, had given them, at least, an implied assent by not energetically demanding delivery of the property and tendering the amount due thereon. We are not convinced that we should change that ruling and recall all that has been heretofore held in that regard.

We have not found any good reason to increase the number of bushels from fifteen hundred and seventy-eight to twenty-one hundred and eighty bushels. The court concluded, heretofore, to adhere to the minimum number. We would not feel justified in changing the number, unless it was manifest that an error had been committed.

We do not change and increase the amount heretofore allowed for the peas sold by the sheriff, particularly, for the reason that the following which appears of record would not warrant an increase:

"It is admitted that this receipt calling for 2,029 sacks of peas, on the reverse of which is written 730 sacks delivered to Mark and Rittner, 1,569 sacks to the sheriff, were stored in the warehouse as weevily peas on the date specified in the receipt."

In view of this fact, we do not think that the price or the weight of the lot should be changed, for it may have been just as deficient in weight as compared with sound peas on the day it was delivered to the storage as on the day it was sold.

To conclude, then, plaintiff is entitled to a judgment for six hundred and ninety-one 59-100 dollars ($691.59), as above stated, with 5 per cent. interest from this date, and to this extent the original judgment is amended, and in other respects it is affirmed, making, with the amount allowed in our original judgment, the sum of nine hundred and fifty-nine 85-100 dollars.

As amended, our original judgment is reinstated and made the judgment of the court.