STAMFORD COMPRESS CO. v. FARMERS' & MERCHANTS' NAT. BANK.

(Supreme Court of Texas.    March 27, 1912.)

Dissenting opinion.

For majority opinion, see 143 S. W. 1142.

RAMSEY, J. Before the original opinion in this case was handed down (143 S. W. 1142), I had prepared a dissenting opinion. On account of my absence when the case was decided, this dissenting opinion was not at the time carried into court, but, by the courtesy of my Associates, was withheld, in order that we all might have the benefit of any discussion and authority which might be included in the motion for a rehearing which, it was assumed, would be filed. This motion I have carefully examined, and have again gone over the opinion of the Chief Justice, speaking for the majority of the court. That opinion contains intrinsic evidence of thorough care and preparation bestowed in its composition, and, it must be confessed, is as strong a presentation of the view of the majority as could be made.

I regret exceedingly that I am yet unable to agree with my Brethren, and more regret that the last word of my judicial career shall be a word in dissent from the conclusion of the majority of the court; but, if I am true to my own convictions and the high ideals which have been a part of the teaching of my life, I must follow my own judgment under all circumstances, and not that of another. It will be understood, of course, that I write with becoming deference, and am impelled so to do by such compulsion of logic as leaves no other course open to me.

Long before I came upon the bench, I had the most profound respect for Chief Justice BROWN, and an intimate association for many months has ripened this confidence into a deep affection. I feel that he deserves, as much as any man who ever lived, the praise which the Tattler ascribes to Chief Justice Holt of England: "He was a man of profound knowledge of the laws of his country and as just an observer of them in his own person. He considered justice as a cardinal virtue and not as a trade for maintenance." But if I am to follow my own convictions, and not those of another, I must and should, on a matter of so great importance, write in some detail the grounds and reasons on which such convictions rest, to the end that, if my views are correct and represent the law as I now see it, they will furnish in the future a reason for their just recognition; or, if I am in error, that there will be opportunity for such legislation as the demands of trade and commerce require.

On May 13, 1908, the plaintiff in error, Stamford Compress Company, executed to Will Rives an instrument in words and figures as follows: "No. 290. Stamford, Tex-

as, May 13, 1908. No. Bales 42. Stamford Compress Company. Received from West Cotton Yard for account of Will Rives, mark —— at owner's risk forty-two bales cotton. Not responsible for water damage or loss or damage by fire. This receipt must be returned on delivery of the cotton and is non-negotiable. [Signed] T. O. Purkett, Supt." It is undenied that the Compress Company received the cotton therein referred to, and that it was engaged in receiving and compressing cotton, so that, for all the purposes of this case, it is and must be treated as a warehouseman.

Soon after this receipt was issued, Rives sold the cotton to one Zethraeus, and drew on him for the agreed value of same by draft, to which was attached his receipt. Under an arrangement with the Farmers' & Merchants' National Bank, this draft was, by Zethraeus, accepted, and with the receipt attached taken by the bank, and the sum drawn for advanced to Zethraeus and paid to Rives. Some time thereafter the plaintiff in error delivered this cotton without the production of the receipt theretofore issued by it, and without actual knowledge that the same had been transferred by Rives, and upon the latter's assurance that such receipt was in the bank at Stamford, and would be by him later obtained and delivered. The Court of Civil Appeals held, in substance, that on this state of case the Compress Company was liable for the value of the cotton, which value was not a matter of dispute, and I think this conclusion is correct.

It may be conceded that none of the cases which I shall hereafter discuss in terms decide the very question here involved; but, as it seems to me, by analogy and necessary implication they are of controlling weight.

In the case of Friedman v. Peters, 18 Tex. Civ. App. 11, 44 S. W. 572, Chief Justice Garrett of the Galveston Court of Civil Appeals uses this language: "The transfer of the receipt or certificate by Shook to the appellants, with the understanding that they should hold the whisky for which it was given for security for his indebtedness to them, operated as a delivery to them of the whisky in the bonded warehouse for that purpose, and placed the same beyond the control of Shook, as between appellants and the warehousemen, without the necessity of notice by the warehousemen of the transfer. Jones on Pledges, §§ 280–330; Gibson v. Stevens, 8 How. 384 [12 L. Ed. 1123]."

Now, the effect of this holding—and this, as I understand, is the universal rule—is that the receipt stands for and is a symbol of the property therein described, and that a delivery of the receipt in law constitutes a delivery of the cotton. Undoubtedly, in this case, if the transaction had been a sale, and Rives had been paid on the spot in money for his cotton, this would, in law, have passed the undoubted title to the cotton, and this, as I believe, without the necessity of

any or further notice. We have in this state no law requiring notice of sales of personal property; even the old common-law of market overt does not obtain in this state.

In the case last cited, the Supreme Court of the United States, speaking through Chief Justice Taney, uses this language: "It is true there is no formal assignment indorsed on the warehouse document. But the technical rules of common-law conveyances and transfers of property have never been applied to mercantile contracts made in the usual course and forms of business. The indorsement of the delivery order upon these evidences of his title, like the indorsement upon a bill of lading, sufficiently manifests the intention of the parties that the title and possession should pass to Gibson. And when that intention is evident from the language of the written instruments and the nature and character of the contract, it is the duty of the court to carry it into execution, without embarrassing it with needless formalities. A contrary rule would most commonly defeat the object which both parties designed to accomplish, and believed they had accomplished, by the instruments they executed."

Another case in point is that of Babcock v. People's Savings Bank, 118 Ind. 212, 20 N. E. 732. In that case, the receipt in question is as follows: "Received from Elles & Knauss, in our William street warehouse, on storage from L. & N., 140 barrels of flour, to be delivered only on return of this certificate, properly endorsed, and payment of charges and insurance." It seems in that case that the savings bank, in good faith, lent Elles & Knauss $4,000, and they delivered to it warehouse receipts. After this had been done, the appellants, the warehousemen, delivered the flour to the depositors, Elles & Knauss, or some other persons, without the return of the warehouse receipts. In discussing this state of case, the court uses this language: "Our judgment is, that the indorsee of the warehouse receipts issued by the appellants, having, in good faith, loaned money upon them, is entitled to the possession of the flour, or to its value, and that the appellants cannot be heard to dispute the indorsee's title, nor to aver that they did not receive the property on the terms specified in the receipts. Those instruments represent as true two very essential things: That they (the warehousemen) received the property mentioned in the receipts as warehousemen; and that it will be delivered only on the return of the certificates, properly indorsed. The plainest principles of justice require that the appellants should not be permitted to deny what they represented, and thus cause loss to one who, in good faith, acted upon their statements, and loaned money upon the faith of their representations. Our conclusion is right, as we believe, in principle, and, is, we know, well sustained by the authorities. Planters', etc., Co. v. Merchants' Nat. Bank, 78 Ga. 574

[3 S. E. 327]; McNeil v. Hill, 1 Woolw. 96 [Fed. Cas. No. 8,914]; First National Bank v. Bates [D. C.] 1 Fed. 702; Whitlock v. Hay, 58 N. Y. 484; Stewart v. Phœnix Ins. Co., 9 Lea [Tenn.] 104; Coolebrooke, Coll. Secur. p. 506. By issuing these receipts, the warehousemen represented that they had the flour in their warehouse, and would there keep it until the certificates were returned; and they, and not an innocent third person, who has relied on their representations, must bear the loss. Quick v. Milligan, 108 Ind. 419 [9 N. E. 392, 58 Am. Rep. 49]; Preston v. Witherspoon, 109 Ind. 457 [9 N. E. 585, 53 Am. Rep. 417]; Cowdrey v. Vanderburgh, 101 U. S. 572 [25 L. Ed. 923]."

It seems very generally to have been held that the transfer of a warehouse receipt operates as a transfer of the title. Davis v. Russell, 52 Cal. 611, 28 Am. Rep. 647; Horr v. Barker, 8 Cal. 613; Merchants' Bank v. Hibbard, 48 Mich. 118, 11 N. W. 834, 42 Am. Rep. 465; Mass. Pub. Sts. c. 72, par. 6; Burton v. Curyea, 40 Ill. 320, 89 Am. Dec. 350; Second Nat. Bank v. Walbridge, 19 Ohio St. 424, 2 Am. Rep. 408; Shepard v. King, 96 Geo. 81; Farmers' Packing Co. v. Brown, 87 Md. 1 (1898), 39 Atl. 625; Tiedman v. Knox, 53 Md. 618; Ruhl v. Corner, 63 Md. 182; Seal v. Zell, 63 Md. 356; Hill v. Colorado Bank, 2 Colo. App. 324, 30 Pac. 489; Bank of Newport v. Hirsch, 59 Ark. 225, 27 S. W. 74; Garoutte v. Williamson, 108 Cal. 135, 41 Pac. 35, 413; Cavallaro v. Texas, etc., R. R., 110 Cal. 348, 42 Pac. 918, 52 Am. St. Rep. 94:

Without undertaking to discuss or analyze the cases, the conclusion to which I have arrived seems to me to be in harmony with the rule obtaining in most jurisdictions in the American Union, and, indeed, all of them, unless it be in Massachusetts and Oregon. Hallgarten v. Oldham, 135 Mass. 1, 46 Am. Rep. 433; Gill v. Frank, 12 Or. 507, 8 Pac. 764, 53 Am. Rep. 378.

The following authorities, not all of which are directly in point, may, I think, be profitably read, and, with more or less directness, seem to me to sustain my view: Adoue v. Seeligson & Co., 54 Tex. 593–609; Whitney v. Tibbitts, 17 Wis. 360–362; Elliott on Ev., vol. 1, § 64, pp. 71–74; Gregory v. Wendell, 39 Mich. 337, 33 Am. Rep. 390; Sacalaris v. Railway Co., 18 Nev. 155, 1 Pac. 835, 51 Am. Rep. 737; Merchants' Bank v. Hibbard, 48 Mich. 123, 11 N. W. 834, 42 Am. St. Rep. 465; Osborn v. Koenigheim, 57 Tex. 92–95; Campbell & Clough v. Alford, 57 Tex. 159; Railway Co. v. Heidenheimer, 82 Tex. 195, 17 S. W. 608, 27 Am. St. Rep. 861; Durr v. Hervey, 44 Ark. 301, 51 Am. Rep. 594–597; Weil v. Ponder, 127 Ala. 296, 28 South. 656; Sloan v. Johnson, 20 Pa. Super. Ct. 643; Banking Co. v. Peacock, 103 Ga. 171, 29 S. E. 752; Marks v. N. O. C. S. Co., 107 La. 172, 31 South. 671, 57 L. R. A. 271, 90 Am. St. Rep. 285; Shingleur-Johnson Co. v. Canton, etc., Co., 78 Miss. 875, 29 South. 770, 57 L. R. A.

800, 84 Am. St. Rep. 656; Millhiser Mfg. Co. v. Gallego Mills Co., 101 Va. 579, 44 S. E. 760; Bush v. Export Storage Co. (C. C.) 136 Fed. 918–933; St. Louis Natl. Bank v. Ross, 9 Mo. App. 399; Conrad v. Fisher, 37 Mo. App. 352, 8 L. R. A. 147; Hale v. Milwaukee Dock Co., 29 Wis. 482, 9 Am. Rep. 603; Boynton v. Payrow, 67 Me. 587.

It seems almost everywhere to have generally been held that instruments, such as this, while not negotiable in a strict legal sense, are treated and regarded as symbols of the property thereby represented, and are sometimes spoken of as the key, in the same sense that the delivery of the key of the warehouse is a symbol of the property therein stored. Regarding them, therefore, as the key, they are nonnegotiable according to the test, both of our statute and of the law merchant; but they do operate to pass possession and title of the property as effectively as if it were manually delivered; and where, as in this case, on account of the bulk of the property, there can conveniently be no such thing as a manual delivery without great inconvenience, the necessities and convenience of trade and commerce make the delivery of the symbol a good delivery of the property thereby represented.

We have been cited to and reliance seems to be placed on articles 308 and 309 of our Revised Statutes 1895 as throwing light upon, and, indeed, controlling the rights of the parties in this case. These articles are as follows:

"Art. 308. The obligee, or assignee, of any written instrument not negotiable by the law merchant, may transfer to another, by assignment, all the interest he may have in the same.

"Art. 309. The assignee of any instrument mentioned in the preceding article may maintain an action thereon in his own name, but he shall allow every discount and defense against the same which it would have been subject to in the hands of any previous owner before notice of the assignment was given to the defendant; and in order to hold the assignor as surety for the payment of the instrument, the assignee shall use due diligence to collect the same."

A careful reading of these articles of our Revised Statutes has led me to believe that they have, and can have, no controlling effect upon the question here. The intent and purpose of these articles of the Revised Statutes was and is, it seems to me, to lessen and, indeed, to abrogate the rigor of the common-law rule, which denied an assignee the right and privilege of suing upon a nonnegotiable instrument in his own name, and to have the effect to permit the maintenance of such a suit by the owner of the instrument, subject, of course, to such defenses as the maker thereof could present and maintain against the original holder. So that, in this case, if the warehouse com-

pany had had a defense as to Rives, either that it without fraud, had executed a duplicate receipt, or had made a mistake in respect to the amount of the goods received into its possession, it could protect itself against any one to whom Rives might thereafter transfer the receipt, and I believe it was not the intention that it should have, and I think the law should have no other or further effect than this.

Briefly summarizing my views as to the legal effect of the whole transaction, these statements of fact, which are not a matter of dispute, and the propositions of law stated above which, as I believe, are sustained by authority, and which seem to me to rest upon sound legal reason and to be necessary and essential to the conduct of the business in which the parties were engaged, and to have been within their contemplation, should be given effect, and the Compress Company should have been held liable for the value of the cotton covered by such receipt. Unless we close our eyes to, and consent to be unmindful as judges of, what we must know as men, we know, realize, and should recognize that when cotton is received by a compress company for storage and compression that it is known both to the storer and the Compress Company and the receipt in question both recognizes and evidences the fact that it has but taken its initial step in the carrying trade of the country which will send it on its long journey beyond the limits of the state, and frequently on the high seas to the farthest islands of the earth, and that it will be necessary, in accordance with the ordinary processes by which such merchandise is held and disposed of, that it shall be handled and dealt with by the banks of the country who furnish and advance the funds by which this immense and valuable crop is financed in this and other states, and that the compress companies knew as well as the person delivering the cotton to them, that they must and will be so treated and dealt with. Therefore, as it seems to me, when, as in this case, the Compress Company issues its receipt, in which it assumes and states that the property evidenced thereby is deliverable on return of the receipt, it, for itself, names the conditions on which it will be delivered, and by necessary implication assures that it will not be otherwise delivered, and that such is not only the evidence of its consent, but practically an invitation to all others to believe and understand that it holds and will hold as bailee of whomsoever shall come into the lawful possession of the receipt it issues, and will continue to hold such property until its receipt is returned to it. There is nothing personal or confidential in its relation to the initial depositor which would limit its obligation to hold for him, and him only. Whether it held the cotton for Rives, for the Farmers' & Merchants' National Bank, or any other person, stranger or friend, such holder could not add to its liability or impose upon it additional burdens. Therefore, as it seems to me, the effect of the receipt is to give notice of and evidence its consent to a holding by it for the benefit of whoever obtains its obligation, and to evidence, not alone its possession of the property, but that such possession of same will continue until the evidence of same, in the way of its receipt, is returned to it. I concede, as the majority opinion holds, that this receipt is nonnegotiable in its strict legal sense; but, as I have said, this, under my view, is not only not a controlling feature, but is a matter of no importance at all in the case.

It may be said that the persons who desire to make advances upon or purchase the property evidenced by the receipt would protect themselves by giving notice of their acquisition of the title to the property evidenced thereby; but it can as well be said, and such under my interpretation and study of them, seems to have been the construction of our courts, that the person who issues the receipt and undertakes by its very terms to protect himself against imposition or losses by requiring its production and surrender before the delivery of the property has, by the very nature of his act, and by the very nature of his receipt, named the condition on which it would surrender the property so held. Besides, as a matter of fact, to require such notice would, in the nature of things, beget confusion, invite litigation, and so disarrange and interfere with the orderly conduct of business as to be substantially impracticable. Besides, if this doctrine of giving notice is to be applied in this case, it must equally be applied to a shipment where the cotton or other product might go over a dozen different lines of railroad in and out of the state, and where, unless the rights of the holder of the receipt are to be protected, the company having the cotton in possession at any particular time might deliver possession thereof without surrendering the bill of lading, or other receipt, and thus defeat the rights of the holder of such bill. This, as I conceive, cannot be the law. The whole matter is rendered clear and the rights of the parties definitely fixed if we proceed on the principle and accept as true the legal rule that the person issuing a receipt, such as this, by so doing consents to and invites others to treat same as its obligation to hold the property therein described for whomsoever may thereafter lawfully obtain it from the person to whom it was issued, and that such warehouseman undertakes to protect itself by requiring the production and surrender of its receipt before parting with the possession of the property. Of course, if these are correct, it would lead to an affirmance of the judgment of the Court of Civil Appeals; but if they are unsound,

as the majority holds, it logically follows, there being no dispute about the facts, that their judgment is correct and should be allowed to stand.

I regret that I have not the time to elaborate the views herein expressed and to discuss at length and undertake to apply the authorities above referred to, as well as those treated and discussed in the opinion of the Chief Justice; but I have rather sought to state the general principles and rules of law which, as it seems to me, should and do control.