## MORRIS et al. v. BURROWS et al. (No. 1509.)

(Court of Civil Appeals of Texas. Texarkana. Nov. 18, 1915.)

1. WAREHOUSEMEN ⟨⟩25 — DELIVERY BY WAREHOUSEMAN.

A warehouseman, issuing for cotton stored nonnegotiable receipts stating no time of delivery, is under obligation to redeliver the cotton on seasonable demand therefor.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 38–47; Dec. Dig. ⟨⟩25.]

2. WAREHOUSEMEN ⟨⟩15 — NONNEGOTIABLE RECEIPTS—TRANSFER.

Where goods are placed in a warehouse and nonnegotiable receipts are issued therefor, the bailor may make a valid transfer of the

receipts. (Vernon's Sayles' Ann. Civ. St. 1914, art. 583.)

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 31–34, 37; Dec. Dig. ☞15.]

**3. WAREHOUSEMEN ☞16—RECEIPTS—TRANSFER—SYMBOLIC DELIVERY OF GOODS.**

The transfer of nonnegotiable warehouse receipts by the bailor operates as between the parties as a symbolic delivery of the goods, and carries the title and constructive possession to the transferee.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. § 35; Dec. Dig. ☞16.]

**4. WAREHOUSEMEN ☞25 — CONVERSION OF GOODS.**

A warehouseman notified through its manager of the transfer of nonnegotiable warehouse receipts converts the goods where the manager thereafter delivers the goods on the mere order of the bailor to one not a holder of the receipts.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 38–47; Dec. Dig. ☞25.]

**5. WAREHOUSEMEN ☞25 — CONVERSION — TRANSFER OF BUSINESS.**

A warehouseman holding cotton as bailee without definite time for delivery, breaches its obligation to redeliver by turning over its business to a successor without the consent of the bailor, and hence is liable for a conversion by the successor.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 38–47; Dec. Dig. ☞25.]

**6. WAREHOUSEMEN ☞25—TRANSFER OF BUSINESS—LIABILITY OF SUCCESSOR FOR CONVERSION—PUBLIC WAREHOUSEMAN.**

Where the manager of a private warehouseman has knowledge that nonnegotiable receipts for cotton have been transferred, and thereafter the manager, as successor to the warehouseman, becomes a public warehouseman under bond, and voluntarily assumes custody of the cotton, without the knowledge of the holder of the receipts, the manager holds the cotton subject to the original bailment contract, and not as a public warehouseman, and for his act in delivering the cotton to one not producing the receipts, though on order of the bailor, the manager is jointly liable with the private warehouseman.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 38–47; Dec. Dig. ☞25.]

**7. WAREHOUSEMEN ☞15—RECEIPTS—"NEGOTIABLE RECEIPT."**

Under Acts 33d Leg. 2d Called Sess., c. 5, § 42, providing that the landlord's lien shall continue so long as the cotton is stored in a warehouse, provided a negotiable receipt has not issued therefor, a simple receipt in form stating no time of delivery of cotton stored, but merely the date of storage, number of the receipt, weight, class, and number of bales, is not a "negotiable receipt."

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 31–34, 37; Dec. Dig. ☞15.]

**8. CONSTITUTIONAL LAW ☞161—LANDLORD AND TENANT ☞254—LANDLORD'S LIEN ON COTTON — STATUTES — OBLIGATION OF CONTRACT.**

Acts 33d Leg., 2d Called Sess., c. 5, § 42, providing that the landlord's lien on cotton shall continue so long as the cotton is in storage in any warehouse, provided a negotiable warehouse receipt has not issued therefor, is applicable to cotton stored before the act took effect, but at a time when the landlord's lien had not expired under Vernon's Sayles' Civ. St. 1914, art. 5477, terminating the lien when the cotton is off the rented premises more than a month, and such retroactive construction of the statute is not a violation of the obligation of contracts.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 494, 495; Dec. Dig. ☞161; Landlord and Tenant, Cent. Dig. §§ 986, 1034–1044; Dec. Dig. ☞254.]

**9. LANDLORD AND TENANT ☞254 — LANDLORD'S LIEN—TERMINATION.**

Where a subtenant ginned cotton on which there was a landlord's lien and hauled it to his own home, which was not the rented premises, and there kept it for two months, the lien was lost under Vernon's Sayles' Ann. Civ. St. 1914, art. 5477, terminating a landlord's lien when the cotton is off the rented premises more than a month, and that the tenant turned over his lien on the cotton to his landlord would not affect the termination.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 986, 1034–1044; Dec. Dig. ☞254.]

**10. LANDLORD AND TENANT ☞254—LANDLORD'S LIEN—TERMINATION—"PREPARATION FOR MARKET."**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 5478a, providing that a landlord's lien shall not be lost by removal of agricultural products for the purpose of being prepared for market, storing cotton when ginned and baled for future sale is not a removal for the purpose of "preparation for market."

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 986, 1034–1044; Dec. Dig. ☞254.]

**11. WAREHOUSEMEN ☞18 — PUBLIC WAREHOUSEMEN—BONDS—RIGHT OF INDIVIDUAL.**

There can be no recovery on a statutory bond of a public warehouseman at the suit of a private individual.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. § 18; Dec. Dig. ☞18.]

**12. APPEAL AND ERROR ☞846 — RECORD — SPECIAL FINDINGS.**

In the absence of findings of fact by the trial court, the special findings cannot be reviewed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3347–3362, 3366; Dec. Dig. ☞846.]

Appeal from Bowie County Court; P. A. Turner, Special Judge.

Action by G. W. Burrows and others against G. W. Morris and others. From judgment for plaintiffs, defendants appeal. Modified.

Johnson & Boswell, of New Boston, and C. A. Wheeler, of Texarkana, for appellants. O. B. Pirkey, of New Boston, and Mahaffey & Keeney, of Texarkana, for appellees.

LEVY, J. This is an action for debt by the appellees, as landlords, against G. W. Morris, their tenant, for rents and advances for the year 1914 in the sum of $584.40, and for foreclosure of the landlord's lien, and against appellants for the value of 10½ bales of cotton, $420.00, alleged to have been converted by them at a time when the plaintiff had a subsisting and unsatisfied lien on the same. The defendants denied the existence of a landlord's lien at the time of the alleged conversion, averring that the lien had expired by reason of the fact that the cotton had been off the rented premises for more

than thirty days prior to the alleged conversion. The defendant Fuller Mercantile Company further pled the execution by G. W. Morris of a chattel mortgage to them on the cotton, and that the cotton had been sold and delivered to them in part payment of the debt secured by the chattel mortgage. The case was tried before the court without a jury, and resulted in a judgment in favor of appellees against the tenant G. W. Morris for the debt sued for and foreclosure of the landlord's ·lien, but against appellants for the value of the 10½ bales of cotton.

The facts establish that plaintiffs were the landlords of G. W. Morris, and had a landlord's lien for their debt, which was for rents and advances to make the crop. The 10½ bales of cotton in controversy were raised on the rented premises in the year 1914. Nine bales of the cotton were gathered and ginned during the months of September and October, and immediately after being ginned and wrapped were removed from the gin to and stored in the warehouse of the Morris-Campbell Warehouse Company; the dates on which the various bales were placed in the warehouse being as follows: September 17, 19, 27, and 29, and October 6, 8, 14, 17, and 26, 1914. The gin was located in New Boston, and the warehouse was located in the same town. The Morris-Campbell Warehouse Company, a partnership, are private warehousemen, and their agent and manager, James Chance, issued and on November 2, 1914, delivered to G. W. Morris a receipt for each of the nine bales of cotton stored by him in the warehouse, giving date the cotton was stored, number of receipt, weight, class, and number of the bale. It appears that G. W. Morris did not have an express agreement with the landlords that he was to place the cotton in storage, but it appears that the landlords knew that it was being put in storage for marketing when the price was suitable, and did not object, but acquiesced in its being stored for the purpose stated. James Chance on November 5, 1914, qualified as a public warehouseman under article 7820, Vernon's Sayles' Annotated Stat. of 1914, and with the consent and by some arrangement of the warehouse company continued as the custodian and had in his possession the nine bales of cotton. On December 26, 1914, James Chance on a simple order from G. W. Morris delivered the nine bales of cotton stored in the warehouse to the Fuller Mercantile Company, without the knowledge or consent of G. W. Burrows, and without demanding or making inquiry about the receipts theretofore issued and delivered. The mercantile company sold the cotton. G. W. Morris, it appears, on December 26, or December 24, 1914, sold the cotton to the mercantile company as a payment on the indebtedness due by him to them, which indebtedness was secured by chattel mortgage upon the cotton. It appears, though, as a fact that must be here adopted, as comprehended in the trial court's judgment on conflicting evidence, that on ´November 2, 1914, G. W. Morris "turned over this cotton" and transferred and delivered the warehouse receipts to appellee Burrows, with the intent and for the purpose of his holding possession of them until the rent debt was paid; and that appellee Burrows two days thereafter gave personal notice thereof to James Chance, agent and manager of the ware· house, and that James Chance consented to hold the cotton in replying, "Then I will look to you for the storage." On January 1, 1914, appellees, having the receipts, made demand of James Chance for delivery of the cotton stored, but were notified by James Chance that he had previously delivered it to the Fuller Mercantile Company on order of G. W. Morris. There is evidence to sustain the findings of the trial court as to the weights and value of the cotton, and the findings are here adopted.

It appears that G. W. Morris sublet some acres of the farm to J. A. Dodd for one and a half bales of cotton rent. J. A. Dodd gathered the bale and a half and had it ginned about October 5, or October 20, 1914, and on the same day hauled it to his own premises, which were not the rented premises, and there stored and held it. The half bale of cotton was packed and wrapped with a half bale individually and separately owned by J. A. Dodd, thus making a single full bale of cotton. At the request of G. W. Morris the bale and a half of cotton were hauled on December 23, 1914, by J. A. Dodd to New Boston, and sold by G. W. Morris to the Fuller Mercantile Company. Appellee Burrows testified:

"I learned one and a half bales of cotton were stored at Dodd's; and it was all right with me; but I never had any conversation with Mr. Morris about this at any time, either before or after it was left there, until Friday before November 2d. Mr. Morris told me then he would turn that cotton over to me, and he did turn it over to me then, and I told Mr. Dodd to bring it into town. Mr. Dodd never brought it to me, and I never tried to move it from the premises."

J. A. Dodd testified:

"This cotton was stored by me from the time it was ginned until it was sold, at my house on my farm, and not on the rented premises. I did not ask either Mr. Morris or Mr. Burrows anything about storing this cotton at my house. Some time in the latter part of November Mr. Burrows wanted me to haul this cotton to town, and I spoke to Mr. Morris about it, and Mr. Morris said that he would send his wagon over and carry it to town himself."

Thus it is concluded as a fact that J. A. Dodd had not delivered the cotton to G. W. Morris or appellee Burrows in payment of security for rent, at the time it was on Dodd's farm, but held the same in his own right and subject to the lien for rent, and that G. W. Morris and appellees each held landlord's liens, but were not actual owners.

of the cotton while it was stored at J. A. Dodd's home, from October 5 to November 4, or from October 20 to November 19, 1914; that the cotton was delivered by J. A. Dodd to G. W. Morris on December 24, 1914, in payment of rent, and that the cotton at the time it was sold to the Fuller Mercantile Company on December 24, 1914, had been removed from and had remained off the rented premises for more than one month.

### After Stating the Case.

Appellants, by proper assignments of error, challenge the judgment against them as erroneous upon the ground that the undisputed evidence shows that the 10½ bales of cotton had been removed from the rented premises and from the landlord's premises for more than one month after it had been ginned for market, and that the appellees had no landlord's lien before the date of the alleged conversion.

[1-4] It is believed that the proper legal effect attaching to the facts entitles the appellees to a judgment in their favor against appellants in conversion of the nine bales of cotton in controversy, but not so as to the bale and a half of cotton raised by J. A. Dodd. It was proven as a fact that the Morris-Campbell Warehouse Company, a partnership, through its manager James Chance, received from G. W. Morris in September and October the nine bales of cotton, with the object of storing it for hire. At the time of storing the cotton the appellees had a landlord's lien on it, and the lien had not at the time expired by operation of law. The warehouse company, acting through its manager, issued to G. W. Morris warehouse receipts for the nine bales of cotton stored, acknowledging that the warehouse company held the cotton in store for the person to whom the receipts were delivered. And it further appears as a fact, as comprehended in the trial court's judgment, that on November 2, 1914, G. W. Morris transferred and delivered to appellee Burrows the warehouse receipts for the nine bales of cotton issued and delivered to him by the warehouse company, in recognition of the landlord's lien and with the intention and purpose of appellee Burrows' holding possession of them until the rent debt for the year 1914 due by him to appellees was paid. It appears as a fact that within two days after the transfer and delivery of the receipts to them by G. W. Morris the appellee Burrows gave notice to the warehouse company through its manager, and that the manager assented to it and to hold appellees for the storage charges of the cotton. The cotton was not stored for a definite time, and the receipts, which were simple receipts, did not state any time for redelivery of the cotton. The facts thus show the creation of a valid express contract of bailment for hire between G. W. Morris and the warehouse company.

In virtue of their bailment contract, which is governed by the same rules as are other contracts, the warehouse company was, as respects G. W. Morris, bailor, under the obligation, besides using ordinary care to safely keep the cotton, to redeliver the cotton to him upon his seasonable demand therefor, the bailment being for no definite time. And issuing and delivering to G. W. Morris warehouse receipts, as the warehouse company did, for the cotton, the bailor, Morris, had the right to make and effect to Burrows a valid transfer and delivery of the same in furtherance of the security of his rental debt to appellees. Article 583, Vernon's Stat.; 40 Cyc. p. 426; Friedman v. Peters, 18 Tex. Civ. App. 11, 44 S. W. 572; Bank v. Bank, 41 Tex. Civ. App. 535, 93 S. W. 209; Bank v. Shearer, 225 Pa. 470, 74 Atl. 351, 17 Ann. Cas. 664. The delivery of the receipts, as a means of obtaining the possession, was, as between such parties, a symbolic delivery of the cotton, and operated, in legal effect, to carry the title and constructive possession of the cotton to the holder of the receipts. Having the right to transfer the warehouse receipt to appellee Burrows, as G. W. Morris did on November 2, 1914, to hold until the rent due by him to appellees was paid, then appellees, as respects G. W. Morris, acquired the bailor Morris' title and rights in the cotton covered by the warehouse receipts, so far as necessary to effect the object in contemplation of the parties. And giving notice to the warehouse company, as appellee did two days after the transfer, of their acquisition of the receipts from the bailor Morris, and the warehouse company assenting thereto, the relation between appellees and the warehouse company, with respect to the cotton, would be the same, and governed by the same rules of law, that obtains between the original parties to the bailment. This fact of notice to the warehouse company of the transfer of the receipts to appellees being established, the warehouse company then had no legal right to deal thereafter with G. W. Morris, independent of appellees' consent or knowledge, respecting the cotton. Compress Co. v. Bank, 105 Tex. 44, 143 S. W. 1142, 144 S. W. 1130, Ann. Cas. 1914D, 1298.

[5] And it is believed that in view of the facts the contract of bailment with the warehouse company was not terminated, so as to free the company of liability to appellees, on November 5th, when James Chance became custodian and continued possession of the cotton as warehouseman. It appears that on November 5, 1914, James Chance filed a bond with the county clerk of Bowie county, in accordance with art. 7820, Vernon's Statutes, designating the Morris-Campbell warehouses as the places where he himself was to carry on and conduct the business of a public warehouseman. And it appearing, without any further statement or explanation, that from the

time James Chance qualified as warehouseman he became custodian and continued in possession of the specific cotton in suit, and as such warehouseman knew the cotton was stored and the owners of it. It does not appear by any evidence how or by what arrangement the warehouse company parted with the possession of the cotton to James Chance. The warehouse company offered no proof in that respect, nor proof of assent of appellees that possession or contract of bailment should be surrendered to Chance, nor do they claim by proof or pleading that the contract of bailment was terminated by them. It must therefore be implied from the circumstances in the record that James Chance on November 5, 1914, with the assent of the warehouse company, took over the possession of the cotton for the purpose of keeping it in store and in continuation on his part of the original contract of bailment. Measured by applicable principles of law the evidence fails, it is thought, to excuse or relieve the warehouse company from its contractual obligation to return to the pledgee the cotton placed in their possession for storing. If the contract of bailment was terminated at the will of the parties thereto, it was the duty of the warehouse company, before they would be relieved of their obligation, to make redelivery of the cotton, being held as specific property, in accordance with the terms of the bailment. They did not do so, and made no effort to do so. Every bailee is bound, in the use of the property, to keep within the terms of bailment. It is immaterial that the change is not injurious to the interests of the bailor; it is enough that it is not within the contract. And failing, as the warehouse company did, to refer the right to transfer and contract the dominion and possession of the cotton to James Chance to any term of the original contract of bailment, or to any agreement or consent of appellees so to do, the warehouse company would appear in no position to set up as a defense against appellees that they have fulfilled the obligation of their contract of bailment by returning the cotton to their bailor or his pledgee. The facts operate as a misdelivery, in respect to appellees, on the part of the warehouse company, to Chance, in violation of the contract with appellees. A bailee, in respect to the bailor, has no more legal justification for contracting away the property bailed into possession and control of another without the consent of the bailor, than a tenant has to contract to deliver the rent cotton to a stranger without the landlord's consent. Therefore, by thus parting with the possession and control of the cotton, the warehouse company, in respect to appellees, so far violated the contract of bailment as to put an end to the bailment and to legally constitute a conversion on their part of the bailed property.

[6] The fact, though, that the warehouse company are liable to appellees does not, in the facts, relieve, it is thought, James Chance from his positive misfeasance contributing to accomplish the wrong in respect to appellees. It is implied from the circumstances that James Chance in commencing on November 5, 1914, to do business for himself as a warehouseman, took over and accepted possession of the specific cotton stored, with the assent and, by some arrangement with the warehouse company. There is no pretense in the evidence that James Chance in any other way acquired possession and charge of the cotton. Chance was not required by law, without his assent, to take over the bailment contract of the warehouse company, nor was the cotton offered or tendered to him for storing, so far as appears, in his quasi public character so as to force him, by operation of law, to receive and store it. In such case, therefore, the taking over by James Chance was independently done, and not with the consent or acquiescence of appellees, and he had no distinct and separate contract of bailment with appellees. James Chance as warehouseman, it appears, made the misdelivery of the cotton to the appellant mercantile company. By undertaking to be custodian of the cotton under and in accordance with the original contract of bailment, with full knowledge thereof, James Chance, by his acts and intention, so far co-operated with the warehouse company in accomplishing misdelivery of the cotton as to become liable jointly with the warehouse company to respond in damages to appellees.

[7, 8] And in view of the legal effect attaching to the facts, it is believed that the appellees had a landlord's lien on the cotton which was a superior lien to the chattel mortgage of the appellant Fuller Mercantile Company. The permanent warehouse law enacted by the special session of the Legislature of 1914 became a law on September 26, 1914. Acts Second Special Session, p. 15. This law extended the landlord's lien to stored products. The provision in section 42 reads as follows:

"The landlord's lien on cotton shall continue so long as the cotton is in storage in any warehouse, whether the same be a warehouse operated under this act, or a private warehouse, provided a negotiable receipt has not issued therefor."

According to the undisputed evidence seven of the bales of cotton were stored immediately after being ginned, in the private warehouse of the Morris-Campbell Company, after the 26th day of September. Two of the bales were immediately stored after ginning on September 17th and 19th respectively. Thus the landlord's lien, as to the two bales, was existing at the time the act of September 26th supplemented and continued the duration of the lien. And the receipt given by the warehouseman—in substance a simple receipt in form—was clearly, it is thought, under elementary principles, not a

negotiable receipt. The effect of the section of the act in question is not, it is thought, to impair the obligation of contract in the manner argued by these appellants. There is not changed or impaired or made void any right or remedy as applied to junior mortgages. And Chance qualified as warehouseman after the law was in effect, and he can therefore predicate no claim as to its being retroactive as to him.

[9] The facts as to the one and one-half bales of cotton show that J. A. Dodd, who raised the cotton, was a subtenant of G. W. Morris, and that after ginning the cotton he hauled it to his own home, which was not the rented premises, and stored it, and it remained there in Dodd's possession from October until December 24, 1914, when Dodd delivered it to G. W. Morris, who sold it. The evidence, it is concluded, shows that J. A. Dodd did not turn the possession of the cotton over to either appellees or Morris, but kept the possession himself until December 24th. There appears evidence going to show that G. W. Morris turned over his interest in the cotton to appellee Burrows. J. A. Dodd being the owner of the cotton, subject to the landlord's lien, it is concluded that his assent to a change of possession was necessary, and that the assent of Morris that Dodd turn it over to appellee Burrows would not sufficiently operate to make a transfer of the cotton to appellees. Until J. A. Dodd made a transfer of the cotton to appellees it remained under J. A. Dodd's control and possession at his home. Therefore appellees are not in a position to claim that they were either lienholder in possession or pledgees of the cotton. And the cotton being off the rented premises for more than a month, the landlord's lien expired by operation of the statute. Article 5477, Vernon's Statutes.

It is thought the cases cited are quite dissimilar in facts to the Dodd cotton of the instant case. The case of Gaw v. Bingham, 107 S. W. 931, was a suit by the tenant against the landlord for conversion. There the hay was "in appellee's barn" and held by him as landlord to secure payment for supplies and advances to the tenant. The effect of the facts was to defeat a suit for conversion of the hay, as against the tenant, because the landlord stood towards the hay in the relation of mortgagee or pledgee in possession of the same. And the same principle of law governed the facts in McMullen v. Green, 149 S. W. 762. In that case Green, the tenant, delivered to the landlord the tickets or receipts for the cotton placed in the cotton yard at Snyder as security for rents, advances and supplies, and the landlord was by reason thereof in possession as mortgagee or pledgee of the cotton at the time of the levy of the attachment. And in Childress v. Harmon, 176 S. W. 154, it is thought the rehearing opinion gave the proper legal effect to the facts of the case.

[10] The appellees, though, insist that they had a lien on the Dodd cotton in virtue of article 5478a, Vernon's Sayles' Statutes. As ordinarily understood, cotton is, "for the purpose of being prepared for market," ginned and baled. Storing cotton, when ginned and baled, for purpose of future sale, adds nothing to its preparation for market. It is therefore believed that the quoted words, used in the article of the statutes, were not intended to mean and include the subsequent storing of cotton after it was ginned, as in these facts.

[11] The objection to the maintenance of suit against the sureties of James Chance must, it is concluded, be sustained. There is no statutory provision authorizing a suit on the bond that James Chance made at the hands of an individual. And it is believed that the pleading declares strictly on the bond as a statutory bond, and fails in legal sufficiency as an action on the bond as a common law, if so, undertaking. This ruling disposes of the first, second, third, seventh, tenth, eleventh, and twelfth assignments of error.

It is concluded that the evidence is not that definite and clear as to warrant this court in disturbing the value and weights of the cotton found by the court, and the thirteenth assignment is overruled.

[12] In the absence, as here, of findings of fact by the trial court, this court cannot review the special findings, and, therefore, the remaining assignments cannot be determined.

The judgment of the trial court is modified so as to provide that appellees recover nothing of the Fuller Mercantile Company for the value of the one and one-half bales of cotton, and nothing at all against the sureties on Chance's bond, and as so modified the judgment of the trial court will be affirmed. The Fuller Mercantile Company will recover of appellees one-half of the costs of appeal, and the appellees will recover of the appellants, including the mercantile company, but not the sureties on Chance's bond, the remaining one-half of the costs of appeal. The sureties on James Chance's bond will recover of appellees all costs incurred by them in the court below and in appeal.